Howard E. MANDELL, Plaintiff–Appellant,

v.

The COUNTY OF SUFFOLK and John Gallagher, Police Commissioner, Defendants–Appellees.

Docket No. 01–7729.

United States Court of Appeals, Second Circuit.

Argued March 7, 2002.

Decided Jan. 17, 2003.

Alan Polsky, Bohemia, New York, for Plaintiff–Appellant.

Diane L. Beckmann, Assistant County Attorney, Hauppauge, New York (Robert J. Cimino, Suffolk County Attorney, Hauppauge, New York, of counsel), for Defendants–Appellees.

Before: CARDAMONE, F.I. PARKER, and B.D. PARKER, Circuit Judges.

CARDAMONE, Circuit Judge.

This is an appeal in an employment discrimination case. There is a nursery rhyme that teaches "sticks and stones may break my bones, but names will never hurt me." Such is a lesson particularly doubtful in the workplace, as illustrated by this case, because alleged epithets and demeaning invective directed at a plaintiff by his or her superiors or co-workers can, if believed by a factfinder, subject an employer to legal liability for discrimination.

Plaintiff Howard E. Mandell, a practicing Jew and a now-retired employee of the Suffolk County Police Department (Suffolk County Police or the department), instituted the instant action against defendants, the County of Suffolk and John Gallagher, its police commissioner, individually and in his official capacity, in the United States District Court for the Eastern District of New York (Mishler, J.).

Adverse employment actions were taken against him, plaintiff contends, because of his religion, and also in retaliation for his June 1987 testimony before the Suffolk County Legislature's Public Safety Committee and for his 1992 interview with *Newsday*, the Long Island daily newspaper. Accordingly, the complaint alleges religious discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and First Amendment retaliation in violation of 42 U.S.C. § 1983. It also asserts claims under New York State's Human Rights Law, N.Y. Exec. Law § 296, and the New York State Constitution, Article 1, § 8.

## BACKGROUND

### I Facts

#### A. *Plaintiff's Allegations of Pro–Catholic and Anti–Jewish Bias Within the Suffolk County Police Department*

Because we are reviewing a dismissal of the complaint at the summary judgment stage, we view the facts in the light most favorable to plaintiff and resolve all factual disputes in plaintiff's favor. *See* Fed. R.Civ.P. 56(c). Plaintiff was employed by the Suffolk County Police for over 30 years, retiring with the rank of deputy inspector in 2001. He joined the department as a police officer in 1969 and attained the rank of captain in 1988, through a series of promotions based on civil service examinations. Mandell asserts that throughout his police career he faced a pro-Christian and, more specifically, pro-Irish-Catholic bias. Further, he contends anti-Semitism for a long time has been a part of the department culture. He has repeatedly been a target of anti-Semitic remarks and taunting, such as being called "that Jew" and "Jewboy" and being told that all Jews stick together, and was subjected to insulting and demeaning conduct by fellow officers. He relates that on one occasion, for example, another officer tossed a dime on the floor before him to see if he would stoop down to pick it up. Plaintiff claims also to have heard virulent anti-Semitic remarks directed at other Jews, such as "f* * *ing Jews" and "f* * *ing Jew lawyer." Although these overt expressions of anti-Semitism in his presence virtually ceased in 1989 upon his promotion to deputy inspector, he attributes this to his rank, not to a shift in the department attitude toward him.

Rabbi Jeffrey Wartenberg, a Suffolk County police chaplain, supported plaintiff's allegations, stating in an affidavit that during his 20 years with the department he had heard many Jewish officers complain about the disparaging remarks made against their religion. Based on his experience, Rabbi Wartenberg concluded that "anti-Semitism is a way of life within the Department" and that Jewish officers had been held back in their careers by superiors with negative feelings about them. He said his complaints to every police commissioner, including defendant Gallagher, did not result in any corrective action, and the Suffolk County Police continues to favor Catholics, while Jewish officers are only promoted in the rare cases where merit is the sole criterion.

#### B. *Plaintiff's Career Before 1997 and His Public Criticism of the Department*

In June 1987, when he was a police lieutenant, Mandell testified before the Suffolk County Legislature's Public Safety Committee. His testimony described the department as insufficiently proactive in fighting organized crime, resistant to change, and more focused on protecting its internal bureaucracy than on protecting the public. He also set out his view that the "old-boy network" within the department covered up officers' misconduct, including criminal activity, and that racism and anti-Semitism were systemic. On the following day, plaintiff's photograph and an excerpt from this testimony appeared on the front page of *Newsday* under the headline, "Suffolk Cop Charges: 'They Look Out For Their Own.'"

Apparently members of the department were offended because in January 1988 plaintiff was expelled from the Suffolk County Patrolmen's Benevolent Association for having "branded the entire department as racist and anti-semites." Plaintiff says his expulsion was another manifestation of the general hostility toward him, triggered by his testimony, that persisted in the department for years.

Later in 1988 Mandell was promoted from lieutenant to captain. This promotion, like those before it, was not discretionary to the commissioner, but based on a civil service examination, subject to the commissioner's bypass. As part of the promotion procedure, Mandell's then-supervisor Inspector John J. Stewart wrote an evaluation that gave a generally positive assessment of plaintiff's work as a police officer, describing him as an "acceptable candidate for promotion to the rank of Captain." In the evaluation Stewart also stated that plaintiff was "a somewhat controversial individual" and complained that he (Stewart) had spent too much time on issues relating to plaintiff, the media, and internal investigations. He wrote, specifically underlining the second clause,

> While I do not consider that the attitude projected [by plaintiff] should necessarily affect [plaintiff's] suitability for promotion [to captain], *I do feel that his attitude should be taken into account when placing him in any future assignment.*

This evaluation was placed in plaintiff's personnel file.

A year later plaintiff was promoted to the rank of deputy inspector. This promotion was distinct from Mandell's preceding promotions because all promotions beyond the rank of a captain were made at the discretion of the police commissioner, who at that time was Daniel Guido. Unlike the commissioners before and after him, Commissioner Guido was not from Suffolk County; he was an outsider and a known reformer. Mandell attributes his promotion to Commissioner Guido's effort to institute a merit-based promotion policy and maintains that after Commissioner Guido's resignation, the department reverted to its "old-boy network's" practices of nepotism and cronyism. The 1989 promotion to deputy inspector was not only plaintiff's sole discretionary promotion; it was also his last.

Several years later, in the summer of 1992, at his supervisor's request, Mandell gave an interview to *Newsday* for its series of articles entitled *"Black 'n' Blue in Wyandanch: Summer in the 1st Precinct."* The series focused on the operation of the predominantly white police force in a predominantly black community of Wyandanch. The second article quoted plaintiff as saying that the Suffolk County Police had difficulty recruiting black officers because the black community viewed police officers as oppressors. The article reported, in addition, plaintiff's comment that he had to remove some officers with racist attitudes from covering Wyandanch despite his efforts to screen officers for racist attitudes before assigning them there.

After the publication of the *Newsday* article, Mandell's co-workers' hostility toward him escalated. For example, other police officers would not talk to him unless they had to, and two police chiefs expressly warned him that his comments in *Newsday* might harm his chances for advancement. Within days of publication, Chief Edwin Michel told him that if he wanted to be a chief he would have to learn to keep his mouth shut, and Chief Gerald Marcoe advised that his career might be adversely affected because he was "still carrying the baggage from having testified," referring to the 1987 Public Safety Committee testimony. In January 1993, five months after the interview, Mandell was transferred from the executive officer position he held in the First Precinct to a post of commanding officer in the Staff Services Bureau. Plaintiff viewed this transfer as punishment because his superiors knew he preferred to work in the more prestigious patrol division rather than in the desk job at Staff Services.

## C. *Plaintiff's Career During Gallagher's Tenure as Commissioner*

In January 1997 defendant John Gallagher became police commissioner of Suffolk County. The crux of plaintiff's complaint is that Gallagher, who is Irish–Catholic, promoted a pro-Catholic mentality in the department. At official police functions Gallagher made statements like "[W]e are all good Christians," and, "[W]e can all work well together because we all went to good Christian schools, were taught by the Christian Brothers and learned good Christian values." Defendants respond that Gallagher's statements were innocuous and taken out of context.

During Gallagher's tenure as commissioner, Shomrim, a fraternal organization for Jewish police officers that Mandell co-founded, saw its membership decrease dramatically; the organization was defunct when plaintiff retired. Plaintiff contends that this occurred under Gallagher's administration because visibility as a Jew in the department was seen as a liability.

On four separate occasions between 1997 and 1999, Gallagher declined to promote plaintiff to the rank of an inspector: on August 4, 1997 (one position open); on September 7, 1998 (two positions open); on August 30, 1999 (two positions open); and on November 7, 1999 (one position open). These promotions went to Catholic officers instead.

When he was passed over the first time in August 1997 Mandell complained to Gallagher about discrimination in the department. Defendant said he would institute a formal internal affairs investigation. Dissatisfied with this response, plaintiff wrote a letter on August 25, 1997 to Suffolk County Legislator Maxine Postal. In the letter he criticized Gallagher's decision to forward his discrimination complaint to Internal Affairs, and labeled defendant as "either the most pathetically inept Commissioner that we have ever had or the most devious." It is sharply contested whether Gallagher saw a copy of this letter prior to the instant litigation.

In November 1999 Gallagher involuntarily transferred plaintiff, who was then a commanding officer—a top-ranking and decision-making position in a division—to the more subordinate position of executive officer. This transfer was perceived as a demotion not only by plaintiff but also by his fellow officers who commented that the transfer was not favorable, not in anticipation of a promotion, and that it was plain the department was trying to force plaintiff to resign.

## II Proceedings Below

The instant action was commenced in March 1999, with an amended complaint filed in February 2000. In the amended complaint Mandell contends that the four denials of promotion to inspector in 1997–1999 and the 1999 transfer to executive officer were motivated in part by religious discrimination and in part by retaliation for his public criticism of the department. At the close of discovery, defendants moved for summary judgment on a number of different grounds. Concluding that plaintiff had failed to establish a *prima facie* case of discrimination or to adduce evidence of a causal connection between the two instances of speech and the adverse employment actions at issue, the district court granted defendants summary judgment on all plaintiff's claims. This appeal ensued. We affirm, in part, and vacate and remand, in part.

## DISCUSSION

### I Standard of Review

A district court's grant of summary judgment is reviewed *de novo*. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000). A district court may award

summary judgment only if, after drawing all reasonable inferences and resolving all ambiguities in the non-moving party's favor (here plaintiff), it concludes that no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). To overcome such a motion, the non-moving party must offer sufficient proof to allow a reasonable factfinder to decide in its favor. In discrimination cases where state of mind is at issue, we affirm a grant of summary judgment in favor of an employer sparingly because "careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." *Graham*, 230 F.3d at 38.

## II Title VII and State Human Rights Law Claims Against Gallagher

 Although the district court ruled in favor of defendant Gallagher on other grounds, the district court's dismissal of plaintiff's Title VII claims against Gallagher in his personal capacity must be affirmed because under Title VII individual supervisors are not subject to liability. *See Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir.2000) (per curiam); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir.1995); *see also Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir.1997) (noting that "an appellate court may affirm the judgment of the district court on any ground appearing in the record"). Individual liability is sometimes possible, however, under New York's Human Rights Law. *Gregory v. Daly*, 243 F.3d 687, 689 n. 1 (2d Cir.2001); *Tomka*, 66 F.3d at 1317. Since the parties have not briefed this issue, either in the district court or on appeal, and because, as discussed below, we vacate the dismissal of the state Human Rights Law claims against the county, we also vacate the dismissal of those state claims against Gallagher, without prejudice

to his raising the issue of individual liability on remand.

## III Title VII and State Human Rights Law Claims Against County

 We analyze plaintiff's federal and state law discrimination claims together since in other contexts we have applied federal standards of proof to discrimination claims under the state Human Rights Law. *See Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.), *cert. denied*, 534 U.S. 993, 122 S.Ct. 460, 151 L.Ed.2d 378 (2001) (age discrimination); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n. 1 (2d Cir.2000) (sex discrimination); *Torres v. Pisano*, 116 F.3d 625, 629 n. 1 (2d Cir.1997) (hostile work environment); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714–15 (2d Cir.1996) (hostile work environment and retaliation). As the parties do not contend that federal and state standards diverge, we will for purposes of this opinion assume that the standards of proof applicable to plaintiff's Title VII and Human Rights Law claims are the same in all relevant respects.

### A. Prima Facie *Case*

 Mandell's religious discrimination claims are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Meiri v. Dacon*, 759 F.2d 989, 994 (2d Cir.1985) (applying the *McDonnell Douglas* framework to a religious discrimination claim). At the first stage of the *McDonnell Douglas* analysis, a plaintiff has the burden of establishing a *prima facie* case of discrimination by showing that he or she: (1) is a member of a protected class; (2) was qualified for the position at issue; (3) was denied the position; and (4) that the circumstances of the adverse employment decision give rise to an inference of discrimination. *Howley v.*

*Town of Stratford,* 217 F.3d 141, 150 (2d Cir.2000); *Rosen v. Thornburgh,* 928 F.2d 528, 532 (2d Cir.1991). Defendants do not contest the first three elements, focusing instead on the fourth element, and contending, as they did in the district court, that the circumstances do not give rise to an inference of discrimination.

■ The burden of establishing a *prima facie* case under *McDonnell Douglas* is minimal. *Howley,* 217 F.3d at 150. In the case at hand, plaintiff's evidence of discrimination falls into three categories: (1) Gallagher's statements indicating his preference for promotion of Christians or Catholics; (2) evidence of department culture tolerant of anti-Semitism; and (3) promotion of Catholic officers on the four occasions at issue.

1. *Gallagher's Comments.* At an official police function shortly after he became commissioner, Gallagher addressed members of the department in a speech replete with references to Christian values and Catholic education, including such comments as the "all good Christians" remarks noted earlier. On another occasion, the commissioner professed his belief in absolute papal authority at a breakfast meeting with department members. From these statements, a reasonable juror could infer that Gallagher viewed Catholicism—or, more broadly, Christianity—as a necessary part of a good police officer's make-up and that he considered non-Christian officers to be lacking the right make-up.

In his response, Gallagher declares that he mentioned Christian schooling only in pointing out that Chief Monteith and he had attended the same school run by the Christian Brothers order, and the Pope's absolute authority, he said, was used as an analogy to a police commissioner's prerogative to circumvent hierarchical channels of communication and to work directly with officers at the various level of the chain of command. At the summary judg-

ment stage, however, we must resolve all factual disputes in plaintiff's favor. Accepting plaintiff's account of Gallagher's comments as true, a reasonable juror could conclude that these comments indicated Gallagher's pro-Christian or pro-Catholic bias.

■ The trial court rejected the proof regarding Gallagher's preference for Catholics as insufficient to support a *prima facie* case of religious discrimination, absent any proof of animus directed specifically at Jews. We think this reasoning was error. First, contrary to the district court's belief, plaintiff did submit evidence of anti-Jewish animus, which we discuss in a moment. Second, to establish a claim of religious discrimination, plaintiff does not have to prove that defendants discriminated solely against his religion. An employer discriminating against any non-Catholic violates the anti-discrimination laws no less than an employer discriminating only against one discrete group, in this case, Jews.

2. *Culture of Department.* Anti–Semitic comments and behavior have traditionally been part of the culture of the Suffolk County Police Department. The facts section detailed the epithets aimed at plaintiff and the department's tolerance for anti-Semitic conduct, such as the coin toss mentioned earlier, which was a reference to the demeaning ethnic stereotype that Jews are "cheap." Although most of these examples of overt anti-Semitism pre-date plaintiff's 1989 promotion to deputy inspector, a reasonable juror could find this improved behavior reflects not a change in attitude, but only greater caution by fellow officers regarding their conduct in the presence of an officer who outranked them.

Further support for plaintiff's allegations about the department's culture bias is provided by the affidavit of Rabbi Wartenberg who served as the Suffolk County

police chaplain for 20 years. Although his affidavit contains a number of conclusory characterizations, Rabbi Wartenberg also avers that he had communicated his concern about anti-Semitic attitudes within the department to every commissioner with whom he had worked, including Commissioner Gallagher. All responded by acknowledging that anti-Semitism was a problem, but failed to take any concrete action to remedy it. For instance, throughout his tenure as a chaplain, Rabbi Wartenberg said he had never seen an official statement issued by a commissioner condemning anti-Semitism, nor had he ever heard of a police officer receiving punishment beyond chastisement for anti-Semitic conduct.

This proof indicates that department leadership, including Gallagher, knowingly tolerated anti-Semitic attitudes and conduct. Interpreted in the light most favorable to plaintiff, it suggests an anti-Jewish bias on defendants' part and therefore further supports the assertion that Gallagher's decisions not to promote plaintiff and to transfer him to a subordinate position were motivated by an illegal animus.

3. *Promotion of Catholic Officers.* On four occasions Gallagher passed over plaintiff for promotion to inspector in favor of others. Of the six deputy inspectors promoted in 1997–1999, five were concededly Catholic. Mandell admittedly does not know the religion of the sixth deputy inspector though he believes he is also Catholic. Defendants do not dispute the religious backgrounds of the promoted deputy inspectors, declaring instead that such promotions are not proof of discrimination.

■■■ A showing of disparate treatment—that is, a showing that the employer treated plaintiff "less favorably than a similarly situated employee outside his protected group"—is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie*

case. *Graham,* 230 F.3d at 39. A plaintiff relying on disparate treatment evidence "must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Id.* Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury. In the instant case, plaintiff has adduced enough evidence to support a finding that the promoted officers and plaintiff were sufficiently similarly situated to support an inference of discrimination. Mandell and the promoted officers were all qualified and Mandell had greater or comparable seniority, having spent more time in rank and more time in the department than all but one officer of those promoted ahead of him.

In contesting the significance of the promotions, defendants first rely on Gallagher's statement that at the time of the promotions he was not aware of the promoted officers' religious backgrounds. Additionally, defendants assert that an inference of discrimination is not warranted because on each of the four occasions the pool of candidates included other deputy inspectors with similar or greater seniority than plaintiff's, some of whom Gallagher knew to be Catholic and yet chose not to promote. Yet, even were Gallagher's denials of knowledge to be believed, it still remains true that in a predominantly Christian department, Gallagher's decision to reject the one known Jewish candidate in favor of a candidate of unknown religion, coupled with his pro-Christian comments, could support an inference of discrimination. In any event, we think the proof detailed in (1), (2), and (3) is sufficient to satisfy plaintiff's minimal *prima facie* burden.

B. *Defendants' Proffer of Legitimate Nondiscriminatory Reasons*

■■■ Given that plaintiff has established a *prima facie* case of discrimination, we now turn to the remaining two stages

of the *McDonnell Douglas* analysis. Under *McDonnell Douglas,* once plaintiff establishes a *prima facie* case, a presumption arises that his employer unlawfully discriminated against him. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To rebut this presumption, the employer must come forward with admissible evidence of legitimate nondiscriminatory reasons for its adverse actions toward plaintiff. *See id.*

With respect to the August 1997 promotion, Gallagher's deposition testimony provides sufficient evidence of legitimate reasons for his decision not to promote plaintiff. Gallagher testified that in evaluating candidates for the August 1997 promotion he relied heavily on the recommendations of police chiefs and the deputy commissioner. Several of the chiefs as well as precinct community leaders recommended the officer ultimately promoted at that time, Deputy Inspector Hamann. In addition, Gallagher maintains that he chose Hamann because Hamann was already working in the precinct where the vacancy existed, and was therefore familiar with conditions there.

Gallagher further attributes his decision not to promote plaintiff to the negative impression plaintiff made on him during a 1997 interview. He states in vague terms that Mandell "did not project the image … of someone who has a positive grasp" of some unspecified "areas" of interest to Gallagher. While defendant does not clarify what particular "image" he was seeking, it appears that the negative impression stemmed at least in part from plaintiff's reaction during the interview to Gallagher's expressed preference for promoting an officer from within the precinct. Plaintiff told Gallagher he considered this approach unfair because it disadvantaged officers in support services functions, a position Mandell then held.

Gallagher's testimony also provides evidence of nondiscriminatory reasons for the post–1997 denials of promotion. Gallagher explains that he chose not to promote Mandell on those three occasions because of plaintiff's derogatory comments about him in the letter sent to County Legislator Postal, which plaintiff wrote after being passed over for the August 1997 promotion. The letter characterized Gallagher as either "inept" or "devious," and it further labeled him a "modern day version of Pontius Pilate" because plaintiff thought that by referring his discrimination complaint to the Internal Affairs Bureau, Gallagher washed his hands of the anti-Semitism problem in the department. Gallagher maintains that he received a copy of the letter prior to the September 1998 round of promotions and was influenced by its content, as well as by the negative impression made on him by Mandell's 1997 interview.

■ Defendants do not articulate any basis for the 1999 transfer from commanding officer to the more subordinate position of executive officer. In fact, in their briefs in the district court and here, defendants address the transfer claim primarily by stating that officers other than plaintiff have also been transferred from commanding officer positions to executive officer positions. Without any evidence with respect to the circumstances of these transfers, the fact they occurred is not relevant to our analysis. Accordingly, defendants failed to carry their burden of establishing legitimate nondiscriminatory reasons for the demotion, and the dismissal of plaintiff's claim of discriminatory transfer must be vacated.

### C. *Plaintiff's Ultimate Burden of Establishing Discrimination*

■ Once the employer produces evidence of legitimate reasons for its ac-

tions, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the real reason for the adverse employment decision was discrimination. Although plaintiff is not required to show "that the employer's proffered explanation is unworthy of credence," evidence of pretext may help plaintiff carry his ultimate burden on this final stage of the *McDonnell Douglas* analysis. *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089.

As noted above, defendants have established legitimate reasons for the 1997–1999 denials of promotions but not for the 1999 transfer. Accordingly, our analysis on the final stage of the *McDonnell Douglas* framework is limited to plaintiff's claims of illegally denied promotions.

Mandell presented evidence suggesting that defendants' reliance on plaintiff's letter to Legislator Postal as a reason for denying plaintiff promotions is pretext. Legislator Postal and her assistant, who handles Postal's correspondence, submitted affidavits stating that they never showed plaintiff's letter to anyone or copied it, and that their practice generally is to treat all incoming correspondence as confidential. Plaintiff similarly denies ever forwarding a copy of his letter to anyone. From this proffer, a trier of fact could find, contrary to defendants' assertions, that Gallagher did not see the letter until the commencement of this law suit and that defendants may therefore be using the letter as a pretext to cover up a discriminatory motive. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

█ Further, even though plaintiff does not present evidence directly contradicting defendants' remaining stated reasons for not promoting him—plaintiff's 1997 interview with Gallagher and, with respect to the 1997 round of promotions, chiefs' recommendations of Hamann and

Hamann's greater knowledge of the precinct—this failure is not fatal to plaintiff's claims. We have previously cautioned that an employer may not rely solely on wholly subjective and unarticulated standards as a basis for its promotion decisions. *Byrnie v. Town of Cromwell, Bd. Of Educ.,* 243 F.3d 93, 104 (2d Cir.2001). An employer's explanation of its legitimate non-discriminatory reasons must be "clear and specific." *Meiri,* 759 F.2d at 997. Here, Gallagher's explanation of the negative impact of the 1997 interview is couched in vague and general terms since the "positive image" that, in his view, plaintiff failed to project is not described in any concrete terms. Given plaintiff's evidence of Gallagher's pro-Christian statements at official police functions, a reasonable factfinder could believe that the sought-after "positive image" incorporated Christian religious affiliation and that Gallagher refused to promote plaintiff because plaintiff did not meet that requirement. Gallagher admittedly knew that plaintiff was Jewish and therefore, even without knowing the other candidates' religion, could have chosen to avoid plaintiff as the one known non-Christian candidate.

Defendants are on more solid ground in relying on police chiefs' recommendations of Hamann and on Hamann's prior knowledge of the precinct as a basis for Gallagher's decision to promote him rather than plaintiff in 1997. Plaintiff has not produced any evidence of anti-Semitic comments or conduct by the five chiefs who submitted recommendations to Gallagher. Contrary to plaintiff's argument, his own and Rabbi Wartenberg's generalized descriptions of pervasive anti-Semitism within the department are not sufficient to support an inference that those five police chiefs' recommendations were in fact tainted by anti-Semitic sentiment. But even here the ultimate decision to accept these recommendations was Gallagher's. Be-

cause, as discussed above, plaintiff has presented evidence indicating Gallagher's pro-Christian bias, we cannot conclude that proof of the police chiefs' recommendations entitles defendants to judgment as a matter of law.

In sum, we think that based on the evidence submitted in support of plaintiff's *prima facie* case and on plaintiff's evidence of pretext, a reasonable juror could find that defendants' 1997–1999 decisions not to promote plaintiff to the rank of inspector were motivated by religious discrimination. We must therefore vacate the dismissal of plaintiff's claims of discriminatory failure to promote under Title VII and the Human Rights Law.

### IV 42 U.S.C. § 1983: First Amendment Retaliation

Analysis turns to plaintiff's claim of First Amendment retaliation under 42 U.S.C. § 1983. Mandell alleges that, by failing to promote him to the rank of inspector in 1997–1999 and by transferring him to the position of executive officer in 1999, defendants illegally retaliated for his public criticism of the department before the County's Public Safety Committee in 1987 and for his 1992 interview with *Newsday*. The district court summarily rejected this claim for lack of proof of causal connection between the speech and the alleged adverse employment actions. On appeal, defendants additionally insist that plaintiff's speech does not enjoy constitutional protection, that he suffered no adverse employment actions, and that he failed to establish a basis for the County's liability under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Further, they maintain that Gallagher is entitled to qualified immunity.

#### A. Retaliation in General

■ Although a public employee "does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment," these rights are not absolute, because the government, as an employer, has a legitimate interest in regulating the speech of its employees to promote the efficiency of its public services. *Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (citing *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). The extent of permissible government regulation of speech under these circumstances is determined by balancing the interest of the employee, in his role as a citizen, in commenting on matters of public concern against the interest of the government, in its role as an employer, in promoting the efficiency of the services it performs through its employees. *Morris v. Lindau,* 196 F.3d 102, 109–10 (2d Cir.1999).

■ Before reaching this balancing test a court must be satisfied that a plaintiff claiming First Amendment retaliation has demonstrated that: (1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action, "so that it can be said that his speech was a motivating factor in the determination." *Id.* at 110; *see also Locurto v. Safir,* 264 F.3d 154, 166 (2d Cir.2001) (describing elements of First Amendment Retaliation claim). If the plaintiff produces evidence of these three elements, the government may nevertheless escape liability on either one of two separate rationales. One way the government may prevail is by demonstrating by a preponderance of the evidence that it would have taken the same adverse action in the absence of the protected speech. *Morris,* 196 F.3d at 110. Alternatively, the government may show that plaintiff's speech was likely to disrupt the government's ac-

tivities, and the likely disruption was "sufficient to outweigh the First Amendment value of plaintiff's speech." *Locurto*, 264 F.3d at 166. If the government relies on the latter rationale and the balance of interests indeed weighs in the government's favor, plaintiff may still succeed by proving that the adverse action was in fact motivated by retaliation rather than by fear of disruption. *Id.*

### B. *Retaliation in This Case*

Applying these principles to Mandell's case, we find wholly unpersuasive defendants' contention that plaintiff's 1987 Public Safety Committee testimony did not enjoy a constitutionally protected status because it was a disgruntled employee's complaint about his own promotional opportunities. Such characterization of Mandell's testimony finds no support in the record. As a general rule, speech on "any matter of political, social, or other concern to the community" is protected by the First Amendment. *Connick*, 461 U.S. at 146, 103 S.Ct. 1684. Plaintiff's testimony criticized the department's approach to fighting organized crime, its resistance to change, and its systemic racism and anti-Semitism. All these subjects are clearly matters of public concern.

Similarly meritless is defendants' contention that plaintiff suffered no adverse employment action. Adverse employment actions include both refusals to promote and demotions. *Morris*, 196 F.3d at 110. It is undisputed that defendants refused to promote plaintiff to the rank of an inspector, and that the 1999 transfer placed plaintiff in a position subordinate to the one he had previously held.

Again, defendants maintain plaintiff failed to establish a causal connection between his public criticism of the Suffolk County Police and the adverse employment decisions. "Causation can be es-

tablished either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Id.* at 110. We think Mandell adduced sufficient direct evidence of retaliatory animus to create a triable question of fact on this issue. Several reasons lead us to this result.

The 1988 letter expelling plaintiff from the Suffolk County PBA expressly stated that he was being removed for having "branded the entire department as racist and anti-semites." This expulsion shows that, at least during the months following Mandell's testimony, a substantial number of police officers viewed the testimony as a betrayal of the department. An evaluation placed in plaintiff's personnel file in May 1988 contained negative comments and recommendations plainly brought on by that testimony. Specifically, Inspector Stewart wrote negatively about plaintiff and although the inspector did not recommend denial of plaintiff's next promotion— the non-discretionary promotion to the rank of a captain—he did emphasize that Mandell's "attitude should be taken into account when placing him in any future assignment." Because this evaluation was placed in plaintiff's file, it could have reasonably impacted Mandell's career opportunities in the ensuing years.

Further, during the days following the *Newsday* interview, Chief Michel told plaintiff that he would have to learn to keep his mouth shut, and Chief Marcoe told him that his career might be adversely affected because of the "baggage" created by his 1987 testimony. The latter comment suggests that negative attitudes towards Mandell caused by that testimony lingered for at least five years. Because both Michel and Marcoe were among those chiefs who recommended candidates

other than plaintiff for the 1997 promotion to inspector, a reasonable factfinder could find their comments indicate a retaliatory animus that influenced their decision not to recommend plaintiff.

Defendants urge that the substantial time lapse between plaintiff's speech and the adverse employment actions precludes a finding of causation. They correctly point out that to provide an independent basis for an inference of causation, temporal proximity must be significantly greater (meaning that the time lapse must be shorter than it is in this case). *See, e.g., Morris,* 196 F.3d at 113–14 (holding that absent other evidence of retaliatory motivation, no inference of causation follows from fact of adverse action occurring two years after speech). It should be noted that *Morris,* the case defendants primarily rely on, was an employment termination case. It makes logical sense that if an employer wishes to retaliate by firing an employee, he is likely to do so soon after the event. In a failure to promote case, however, the opportunities for retaliation do not necessarily immediately present themselves. Be that as it may, however, plaintiff here does not rely on temporal proximity as affirmative evidence of causation. He offers instead direct evidence of retaliatory animus discussed above. Further, some of plaintiff's evidence—namely, Inspector Stewart's evaluation and Chief Marcoe's 1992 reference to the "baggage" of the 1987 testimony—indicates that plaintiff's criticism of the Suffolk County Police may have had a lasting effect on plaintiff's career. In light of this evidence, we cannot conclude that the time lapse, though admittedly lengthy, conclusively establishes lack of causation.

Defendants also declare that an inference of causation is not justified because Gallagher said he was not aware of plaintiff's negative statements about the department until after the 1997 denial of pro-

motion, and because plaintiff received one discretionary promotion after his 1987 testimony. Yet, a trier of fact does not have to believe Gallagher's denials of knowledge, since in making his 1997 promotion decision Gallagher consulted police chiefs who were aware of both the testimony and the interview. Further, Gallagher's denials of knowledge, even if truthful, are not dispositive because, as noted a moment ago, Gallagher's choice in 1997 was based on recommendations of police chiefs, two of whom had made statements indicative of retaliatory animus. Moreover, Gallagher's asserted lack of knowledge is irrelevant to the remaining denials of promotions and to the 1999 transfer decision, as Gallagher admittedly reviewed plaintiff's 1987 testimony shortly after the 1997 denial of promotion.

Nor does plaintiff's claim of retaliation fail because of his 1989 promotion to deputy inspector. First, no promotions followed the 1992 *Newsday* interview, the second instance of protected speech. Second, a reasonable juror could find that Commissioner Guido's administration in 1989 had a fairer and more merit-driven promotion policy than Gallagher's administration in 1997–1999.

As a consequence, we believe plaintiff submitted adequate proof to support a finding that his public criticism of the department affected defendant Gallagher's promotion and transfer decisions.

■ Finally, we reject defendants' argument that the state's interest in regulating Mandell's speech outweighed his interest in the speech simply because when he gave his *Newsday* interview he held the rank of deputy inspector. Defendants advanced no reason why the interview was likely to disrupt the department's operations, nor has our own review of the *Newsday* article revealed any basis for such a conclusion. *See Lewis v. Cowen,* 165 F.3d

154, 162 (2d Cir.1999) ("The government bears the burden of demonstrating that the speech threatens to interfere with government operations.").

### C. *Municipal Liability*

 A municipal entity may be liable under 42 U.S.C. § 1983 only if the alleged constitutional violation was caused by the entity's "policy or custom." *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. The "policy or custom" requirement, however, "is intended simply to distinguish acts of the municipality from acts of its employees, in order that municipal liability be limited to conduct for which the municipality is actually responsible." *Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 142 (2d Cir.1999). Thus, if the challenged action is directed by an official with "final policymaking authority," the municipality may be liable even in the absence of a broader policy. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."). Here, plaintiff challenges as retaliatory employment decisions made by Gallagher, who, as the Suffolk County police commissioner, had authority to set department-wide personnel policies. Gallagher's position provides a sufficient basis for holding the County liable for his adverse decisions with respect to plaintiff.

### D. *Qualified Immunity*

 Under the doctrine of qualified immunity, a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights. *See, e.g., Lewis*, 165 F.3d at 166–67 (describing the qualified immunity doctrine). Where specific intent of a defendant is an element of plaintiff's claim under clearly established law, and plaintiff has adduced sufficient evidence of that intent to defeat summary judgment, summary judgment on qualified immunity grounds is inappropriate. *See Locurto*, 264 F.3d at 169–70; *Sheppard v. Beerman*, 94 F.3d 823, 828 (2d Cir.1996). In the present case retaliatory intent is an element of plaintiff's claim, and we have already noted that plaintiff's evidence of retaliatory animus is sufficient to make defendants' motivation a triable issue of fact. Until that issue is resolved by a factfinder, therefore, the retaliation claim against defendant Gallagher cannot be dismissed on qualified immunity grounds.

In sum, we conclude that the district court erred in dismissing Mandell's retaliation claim for lack of evidence of causation. And because defendants' remaining arguments lack merit, we must vacate the dismissal of this claim and remand it to the trial court.

### CONCLUSION

For the foregoing reasons, we affirm the dismissal of the Title VII claim against Gallagher in his personal capacity, vacate the district court's judgment in all remaining respects, and remand the case to the district court for further proceedings not inconsistent with this opinion.