BEECHWOOD RESTORATIVE CARE CENTER, Brook Chambery and Olive Chambery, Plaintiffs–Appellants,

v.

Laura E. LEEDS, Edmund Russell Altone, Robert W. Barnett, Anna D. Colello, Arlene L. Gray, Henry M. Greenberg, Antonia C. Novello, Steven B. Steinhardt, Dennis P. Whalen, Sanford Rubin, Susan T. Baker, Sharon A. Carlo, Cynthia T. Francis, Naomi B. Hauser, Joseph P. Moore, Mary Elizabeth Rich, Barbara W. Saner, Sue Kelly and Michael Daniel, Defendants–Appellees.

Docket No. 04–3248–CV.

United States Court of Appeals, Second Circuit.

Argued: July 11, 2005.

Decided: Jan. 31, 2006.

148

Mark A. Grannis, Harris, Witshire & Grannis, LLP, (Christopher J. Wright, Timothy J. Simeone, Harris, Witshire & Grannis, LLP, Kevin S. Cooman, Peter J. Weishaar, McConville, Considine, Cooman & Morin, P.C., Rochester, NY, on the brief), Washington, D.C., for Appellants.

Shaifali Puri, Assistant Solicitor General, State of New York (Eliot Spitzer, Attorney General of the State of New York, of counsel Michelle Arnowitz, Deputy Solicitor General, on the brief), for Appellees.

Before: JACOBS and B.D. PARKER, Circuit Judges, and HURD, District Judge.*

JACOBS, Circuit Judge.

Beechwood Restorative Care Center, a partnership owned by Olive Chambery and (her son) Brook Chambery, operated a nursing home in Rochester, New York. Following a series of escalating disputes between Brook Chambery and regulatory authorities—disputes in which Brook Chambery sometimes at first prevailed—the Beechwood facility lost its operating certificate and closed in 1999. The Chamberys and the partnership appeal from a judgment entered on May 4, 2004 by the United States District Court for the Western District of New York (Larimer, *J.*), dismissing on summary judgment their complaint alleging under 42 U.S.C. § 1983 that certain employees of New York's State Department of Health ("DOH") and of the federal Health Care Financing Administration ("HCFA") arranged to revoke the state-required operating certificate for the facility [i] as retaliation for protected speech by which Brook Chambery challenged regulatory findings and rulings, in violation of the First and Fourteenth Amendments; and [ii] without notice and an opportunity for hearing, in violation of the Chamberys' rights under the Fifth and Fourteenth Amendments. We affirm in part and in part vacate and remand.

## BACKGROUND

Until it closed its doors in July 1999, Beechwood Restorative Care Center was a skilled nursing facility operated by a partnership between Olive Chambery and her son Brook. Like all New York nursing homes, Beechwood was regulated jointly by DOH and HCFA.

### A

In 1994, Brook Chambery and DOH began clashing over regulatory matters. When DOH denied Beechwood's application to add two short-term beds in 1994, Chambery challenged the denial in an Article 78 petition; DOH backed down and requested that the proceedings be dismissed. When DOH identified two D-level[1] deficiencies in the course of federally-mandated surveys of the Beechwood premises in 1995, Chambery challenged the deficiencies in an informal dispute resolution process afforded by federal regulation; DOH backed down and the deficiencies were withdrawn. *Beechwood Restorative Care Center v. Leeds,* 317 F.Supp.2d 248, 256 (W.D.N.Y.2004). In November 1996, three more D-level deficiencies were alleged by DOH, one of which was withdrawn after Chambery lodged a challenge. *Id.* In 1996, Chambery commenced an Article 78 proceeding challenging DOH's procedures for the transfer and discharge of residents from nursing homes; the proceeding was ultimately resolved by a consent order in March 1997. *Id.* at 256. According to the Chamberys, this pattern of challenged deficiencies continued through 1999, escalating in frequency and seriousness. *Id.* at 257.

* The Honorable David N. Hurd of the United States District Court for the Northern District of New York, sitting by designation.
1. DOH categorizes deficiencies found at nursing homes "from 'A' (an isolated deficiency causing no actual harm and only the potential for minimal harm to a resident) to 'I' (a widespread deficiency causing immediate jeopardy to residents' health or safety)." *Beechwood Restorative Care Center v. Leeds,* 317 F.Supp.2d 248, 256 (W.D.N.Y.2004). "A 'D' deficiency is defined as an isolated deficiency with no actual harm, but with the potential for more than minimal harm that would not put residents' health or safety in immediate jeopardy." *Id.*

Beginning in 1996, Chambery opened a new front. As the district court characterized it, Chambery "began sending ... a 'voluminous' series of letters and other papers to DOH and other state officials protesting various aspects of DOH's policies and practices, and advocating a number of changes." *Id.* at 256. Thus, from 1997 through 1999, Chambery engaged in a "campaign with DOH to either enforce or eliminate" a requirement that nursing home operators sign Medicaid Access Agreements in order to make major changes to their facilities. *Id.* at 257 (internal quotation omitted). Chambery contended that this requirement was onerous and unnecessary, and that it conferred competitive advantage on operators who signed the Agreements without intending to comply. *Id.* at 256.

In early 1999, surveys of Beechwood conducted by DOH identified new deficiencies, classified at the more serious K-level—*i.e.*, a pattern of violations constituting immediate jeopardy to residents. DOH recommended to HCFA that Beechwood be terminated as a Medicare and Medicaic provider unless those deficiencies were removed within eighteen days. New surveys, conducted by DOH on May 12, 1999 and again on June 14, 1999, identified no K-level deficiency, but charged deficiencies at the G-level—*i.e.*, actual harm with potential for more than minimal harm, though no immediate jeopardy. DOH later notified the partnership that HCFA was prepared to terminate Beechwood as a processor of Medicare and Medicaid—and HCFA ultimately did. For its part, DOH commenced an administrative hearing on June 23, 1999 to consider whether to revoke the facility's operating certificate—a document required to operate a nursing home under New York law. *See Spiegel v. Whalen*, 44 N.Y.2d 745, 405 N.Y.S.2d 679, 376 N.E.2d 1323, 1324 (1978).

The thrust of the complaint in this action is that all these measures were taken by DOH to humiliate the Chamberys and ruin their business as punishment for Chambery's exercise of his First Amendment right to stand up to the regulators, challenge them in proceedings, and criticize their requirements and procedures.

## B

An administrative law judge ("ALJ") conducted an evidentiary hearing on DOH's claim that the partnership's operating certificate should be revoked, and issued a 97-page report upholding most of the charges, finding that:

• Beechwood neglected some residents "in several significant aspects of care," such as failing to notify a resident's physician of significant changes in the resident's condition.

• Beechwood had failed to timely notify a resident's physician regarding a "potentially serious or life threatening illness ...."

• Beechwood failed to fulfill its obligation to provide appropriate care and monitoring for a particular resident, and that "the record [wa]s devoid of documentation as to the last 5 hours of the resident's life ...."

• Beechwood failed to take adequate measures to prevent or treat some residents' pressure sores.

• One Beechwood resident was "subjected, without any reasonable explanation, to an indwelling catheter in place for almost 9 days instead of Beechwood following a physician order of 3 to 4 days."

• Beechwood took insufficient steps to safeguard residents who were at risk of falling.

• "[A] number of Beechwood residents were not provided adequate pain con-

trol," and in several instances physicians' orders were not carried out.

The ALJ rejected Beechwood's allegations of improper motive, finding that (1) DOH "took numerous steps in its attempt to keep Beechwood open;" (2) Beechwood failed to take advantage of the opportunities afforded by DOH to rectify the problems with the facility; and (3) the "plans of correction" submitted by Beechwood to DOH consisted in large part of "denials of events that were found, attacks on the messengers (surveyors) and a barrage of information not relevant or consequential to the cited deficiencies," while in fact "no correction was taking place." The ALJ emphatically rejected Beechwood's allegations of regulatory "bias or ill will."

Consistent with the recommendation of the ALJ, DOH issued an order revoking Chambery's operating certificate and imposing a $54,000 penalty.

The Chamberys inquired of DOH as to how Beechwood could be transferred as a nursing home to a third party, a transaction which would require transfer of the "establishment approval" that "gives the medical facility the right to exist." *Spiegel,* 405 N.Y.S.2d 679, 376 N.E.2d at 1324. DOH's general counsel (appellee Henry M. Greenberg) responded in a February 2, 2000 letter to Beechwood's lawyer, advising that "since the operating certificate of Beechwood has been revoked and the facility closed," there was no "establishment approval to be transferred," and noting that any potential buyer who wished to use the premises as a nursing home would be required to go through the normal authorization procedures for such facilities, but advising that such authorization was unlikely at that time. *Id.* at 258, 405 N.Y.S.2d 679, 376 N.E.2d 1323. The

Beechwood property found no buyer, entered foreclosure, and was sold at public auction in March 2002.

## C

The complaint in this action, served thereafter, named seventeen DOH defendants and two federal HCFA defendants, and alleged, *inter alia:* [i] section 1983 claims for First Amendment retaliation and denial of equal protection, based on the revocation of Beechwood's operating certificate; [ii] a section 1983 claim for denial of procedural due process, asserting that DOH annulled Beechwood's establishment approval without the required notice and opportunity for hearing; and [iii] a *Bivens* claim against the HCFA defendants. *Id.* at 261, 405 N.Y.S.2d 679, 376 N.E.2d 1323. The district court dismissed all claims on summary judgment. *Id.* at 286, 405 N.Y.S.2d 679, 376 N.E.2d 1323. Appellants appeal the grant of summary judgment as to the First Amendment, Equal Protection, and Due Process claims.[2]

## DISCUSSION

We review the district court's grant of summary judgment *de novo,* reviewing the evidence in the light most favorable to Appellants. *See Anthony v. City of New York,* 339 F.3d 129, 134 (2d Cir.2003). Summary judgment is proper if "there is no genuine issue as to any material fact" and Appellees are "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### I. First Amendment Retaliation

Appellants principally claim that DOH, in retaliation for Brook Chambery's many

---

**2.** During the state administrative hearing, the Chamberys appealed Beechwood's termination as a Medicare/Medicaid provider. Those proceedings, which have no bearing on this appeal, are ongoing. *Id.* at 260–61.

complaints, protests, and lawsuits, conducted repeated nit-picking surveys of Beechwood, trumped up allegations of deficiencies, and enlisted the help of HCFA officials, all culminating in the revocation of the Chamberys' operating certificate; and that this violated Appellants' right against retaliation for speech protected by the First and Fourteenth Amendments.

■ To survive summary judgment on a section 1983 First Amendment retaliation claim a plaintiff must demonstrate that he engaged in protected speech, and that the speech was a substantial or motivating factor in an adverse decision taken by the defendant. *See Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). It is undisputed that Brook Chambery's complaints, protests, and lawsuits are protected speech. *Cf. Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988) (describing "right to petition government for redress of grievances" as "guaranteed by the First and Fourteenth Amendments"). The district court ruled that the claims were barred by the doctrine of collateral estoppel because in the state administrative hearing concerning DOH's request to revoke the Chamberys' operating certificate, the ALJ considered and rejected the partnership's arguments that DOH was driven by an improper motive. *See Beechwood,* 317 F.Supp.2d. at 261–72. In the alternative, the district court ruled that Appellants failed to produce sufficient evidence of any improper motive. *Id.* at 274–75. We disagree on both grounds.

a. *Issue Preclusion*

■ In a section 1983 action, the preclusive effect of state administrative findings is governed by New York law. *Kosakow v. New Rochelle Radiology Assoc.,* 274 F.3d 706, 728 (2d Cir.2001). Under New York law, a prior decision has preclusive effect as to any issue that (*inter alia*) both

(1) was "necessarily decided" in the first action, *and* (2) is "decisive" in the later action. *See Jeffreys v. Griffin,* 1 N.Y.3d 34, 39, 769 N.Y.S.2d 184, 801 N.E.2d 404 (2003); *Kaufman v. Eli Lilly & Co.,* 65 N.Y.2d 449, 455, 492 N.Y.S.2d 584, 482 N.E.2d 63 (1985); *see also Town of Deerfield v. FCC,* 992 F.2d 420, 428–29 (2d Cir.1993).

■ The ALJ's finding that DOH was unbiased was made as part of an evaluation of DOH's credibility. That ruling—if decided necessarily by the ALJ—would be decisive of the present case, which requires a showing of bias.

Appellants concede that the ALJ "necessarily decided" the sufficiency of the State's evidence of *violations.* Sufficiency on that score, however, does not defeat Beechwood's present claim, because a plaintiff can prove First Amendment retaliation even if the measures taken by the state were otherwise justified. *See, e.g., Leather v. Eyck,* 180 F.3d 420, 426 (2d Cir.1999) (denying summary judgment on First Amendment selective prosecution claim where plaintiff was convicted of underlying offense); *see also Waters v. Churchill,* 511 U.S. 661, 681, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality op.) (denying summary judgment where defendants "would have been justified in firing [plaintiff] for [certain] statements" but there remained a question as to defendants' "actual motivation"); *Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 557 (2d Cir.2001) (denying summary judgment where employer could have terminated plaintiffs on account of disruptiveness of speech but there was a material issue as to whether, "even if such disruption occurred, plaintiffs were in fact not dismissed because of the disruption, but because of the content of their speech").

The issue of bias was considered and decided by the ALJ, who found "Beech-

wood's claim of a conspiracy ... to be a total, complete and ridiculous fabrication without a shred of evidence or support." But the issue was considered in the context of the partnership's challenge to the credibility of DOH personnel. In so doing, did the ALJ decide the issue "necessarily"?

This is a showing that the State, as proponent of collateral estoppel, has the burden to make, *Jeffreys v. Griffin*, 1 N.Y.3d 34, 39, 769 N.Y.S.2d 184, 801 N.E.2d 404 (2003), and must clearly establish, *Colon v. Coughlin*, 58 F.3d 865, 869 (2d Cir.1995).

█ An issue that is "necessarily decided" must have been both "actually decided" (as it was here) and "necessary to support a valid and final judgment on the merits" (which is not so clear at all). *See Leather*, 180 F.3d at 426; *Wilder v. Thomas*, 854 F.2d 605, 620 (2d Cir.1988). We are not persuaded that the ALJ's discussion and rejection of the partnership's allegations of improper DOH motives was "necessary" in that sense. The decisive issue before the ALJ was whether "Beechwood has demonstrated a pattern of poor resident care, as well as a failure ... to take corrective action." The ALJ's conscientious discussion of motive concerns the *credibility* of evidence presented by DOH; and while that may have *impacted* the ALJ's findings of violations, the State has not shown to us that the ALJ's credibility findings were so influential as to be actually decisive of the ultimate question concerning the quality of resident care: The charges against the partnership might have been sustainable even if they were animated by bias and retaliation. The State, which shoulders the burden on this point, has made no showing as to the scope of the ALJ's jurisdiction, or as to whether a finding of improper motive or adverse credibility would have made a difference—

necessarily—in the ALJ's ultimate determination. We therefore conclude that issue preclusion does not bar litigation of the First Amendment retaliation claim.

Relying on *Scott v. Coughlin*, 344 F.3d 282, 287–88 (2d Cir.2003)—which held that an agency is entitled to summary judgment on a First Amendment retaliation claim if it can show that "it would have taken exactly the same action absent the improper motive"—DOH argues that the surveys undertaken, the deficiencies found, and the resulting revocation of the operating certificate, were statutorily required. However, even if the pre-revocation surveys were mandated, and even if the State must commence revocation proceedings once it has determined that certain classes of deficiencies exist, N.Y. Pub. Health Law § 2806–b, the identification, characterization, and classification of the actual deficiencies found are within the State's discretion, and are therefore subject to a claim of improper motive.

b. *Merits: DOH Officials*

█ Beechwood produced sufficient evidence of retaliatory motive to survive summary judgment. Suspect chronology—the close sequence of protest and scrutiny—constitutes circumstantial evidence, along with evidence that the 1999 "Offensive" was pre-planned. But much of this circumstantial evidence is likewise consistent with a zealous adversarial posture arising from the regulatory mission. *See Blue v. Koren*, 72 F.3d 1075, 1084 (2d Cir.1995) (granting summary judgment where plaintiff produced no direct evidence of retaliatory motive). Among the other evidence cited by the partnership is the e-mail reaction of two DOH administrators to the news that the federal government would revoke Beechwood's Medicare/Medicaid provider agreement; they rejoiced with exclamations of "AMEN & HALLELU-

JAH" and "HOT DIGGITY DAWG" (followed by 50 exclamation marks). A sense of triumph and satisfaction could, however, be as consistent with a job well done as with an improper motive.

There is direct evidence, however, that the State's hostile pursuit of the partnership was motivated by an intent to punish the partnership for exercising First Amendment rights of speech and petition rather than by—or distinctly in addition to—the antagonism that arises between a regulator and the regulated (a relationship easily inflamed by difficult personalities). One third-party affidavit related a statement by a DOH surveyor admitting that the partnership's troubles with DOH were caused by Brook Chambery's previous lawsuits against DOH and Sanford Rubin (DOH's Regional Director), and that DOH and Rubin "were going to get" Chambery for it. Another affidavit recounted an exchange at a conference in which a DOH deputy director lamented that the closing of Beechwood "was a horrible situation that I hope to never go through again. We had to close that facility for all the wrong reasons." A gloating e-mail from defendant Rubin to DOH personnel is fairly explicit: "[a]nother advantage on our side is that HCFA claims it will back us all the way ... they too have been harassed by Chambery. The chickens are coming home to roost."

This is evidence from which a jury could reasonably find that the DOH was campaigning against the partnership as retaliation for the exercise of First Amendment rights. We therefore vacate and remand as to the First Amendment claim.[3]

### c. Merits: HFCA Officials

■ As to defendants Kelly and Daniel, the federal (HCFA) appellees, there is insufficient evidence. A federal actor may be subject to section 1983 liability where there is evidence that the federal actor was engaged in a "conspiracy" with state defendants, see, e.g., Kletschka v. Driver, 411 F.2d 436, 448–49 (2d Cir.1969). In this case, Beechwood points to evidence that Kelly and Daniel were supportive of DOH's effort to revoke the operating certificate, and were invested more generally in the effort to shut down Beechwood. There is the chicken-roosting e-mail from state defendant Rubin that "HCFA will back us all the way," as well as one side of an e-mail correspondence in which state defendant Leeds states "[w]e have been working with HCFA on this one and HCFA has been cooperative as Mr. Chambery has tried to go around the state to HCFA."

■ Cooperation between state and federal bureaucracies acting in their regulatory spheres supports no inference that the federal actors acted with an improper motive. See Hafner v. Brown, 983 F.2d 570, 577 (4th Cir.1992) (concluding that § 1983 civil conspiracy requires "a meeting of the minds to accomplish the *unlawful act*" (emphasis added)); cf. Strickland v. Shalala, 123 F.3d 863, 868 (6th Cir.1997) (worrying about rendering "the United States subject to § 1983 liability in every case arising out of a cooperative federalism

---

**3.** Appellees mention an absolute immunity defense in passing, but that defense is considered waived since it only appears in a footnote. See United States v. Restrepo, 986 F.2d 1462, 1463 (2d Cir.1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review."). And we decline to overlook the waiver. See Mandell v. County of Suffolk, 316 F.3d 368, 385 (2d Cir.2003) ("Where specific intent of a defendant is an element of plaintiff's claim under clearly established law, and plaintiff has adduced sufficient evidence of that intent to defeat summary judgment, summary judgment on qualified immunity grounds is inappropriate.").

scheme"). There is no evidence suggesting that the federal defendants acted based on an unconstitutional animus as opposed to a spirit of cooperation. Therefore we affirm the judgment of dismissal as to the federal defendants.

## II. Equal Protection

For essentially the same reasons underlying the First Amendment retaliation claim, the partnership alleges a violation of its equal protection rights under the Fifth and Fourteenth Amendments. However, an equal protection claim requires (*inter alia*) evidence from which a jury could find that the plaintiff was selectively treated as "compared with others similarly situated." *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir.1999); *see also LaTrieste Restaurant and Cabaret, Inc. v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir.1994). As the district court observed, Appellants have failed to produce evidence of any "similarly situated" individual or institution treated more favorably than Appellants. *Beechwood*, 317 F.Supp.2d at 276–78.

██ The partnership has adduced some evidence that the revocation of its operating certificate was an unusual measure, but, as the district court soundly observed, some sanctions may be imposed rarely because they are rarely justified. *Id.* at 276.[4]

Moreover, as the partnership affirmatively contends and illustrates, it was resistant to DOH recommendations. While DOH was not permitted to retaliate on the ground that the partnership exercised its First Amendment rights, it is obvious that, given Brook Chambery's confrontational approach to regulation, DOH might well decide that this particular facility presented the highly unusual instance in which harsher sanctions are needed because DOH could not rely on voluntary compliance and willing reforms. Conclusory assertions—that Beechwood was a "better than average nursing home subjected to worse-than-average treatment," and that Beechwood was subjected to "harsher-than-usual penalties" and "shorter-than-usual timetables"—are not enough to show dissimilar treatment among those similarly situated, at least not at this stage of the proceedings.[5] Appellants rely on *DeMuria v. Hawkes*, but *DeMuria* held only that "at the pleading stage," the plaintiffs' conclusory allegation that they were treated differently from others was sufficient, "albeit barely." 328 F.3d 704, 706–07 (2d Cir.2003). "[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting *summary judgment.*" *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir.1996) (emphasis added).

Finally, Appellants invite the comparison between their treatment at the hands

---

4. Appellee Susan T. Baker testified that she had been involved with facilities that were in a state of "Immediate Jeopardy" or that were providing a "substandard quality of care," but that to her knowledge Beechwood was the first facility that was terminated as a Medicaid/Medicare provider. Appellants make no argument that the circumstances in such cases were comparable to those here, either in terms of the number or severity of deficiencies underlying the action taken (in fact, this evidence is nowhere mentioned in the equal protection claim section of Appellants' brief); and in any case, it is the revocation of Beechwood's *state* operating certificate, not Beech-

wood's termination as a *federal* Medicare/Medicaid provider, that is at issue in this case.

5. Beechwood references a DOH press release describing an incident at a New York hospital in which a patient died after unauthorized personnel and equipment were used in surgery; a fine was levied against the hospital but, apparently, the hospital's operating certificate was not revoked. Appellees do not respond to this example, which is unsurprising since it is mentioned only in footnote. *See Restrepo*, 986 F.2d at 1463.

of regulators *before* the Chamberys' skirmishes with the DOH began and *afterward*. In *LaTrieste Restaurant and Cabaret, Inc. v. Village of Port Chester*, we held that the plaintiff satisfied the "similarly situated" requirement by producing evidence that the defendants did not enforce a zoning ordinance against the plaintiff until the plaintiff engaged in protected conduct—that conduct being *the only change in plaintiff's circumstances*. 40 F.3d 587, 590. Here, the revocation of the operating certificate followed protected conduct; but, as Appellants concede, the revocation also followed substantiated charges of new serious deficiencies. The partnership cannot establish differential treatment through a before-and-after approach.

### III. Due Process

 The Chamberys cite N.Y. Pub. Health Law § 2801–a(10)(b)(i), which provides that "no approval of establishment shall be revoked, limited or annulled without first offering the person who received such approval the opportunity of requesting a public hearing," and they argue that the "annulling" by DOH of Beechwood's establishment approval without providing the opportunity for a hearing was thus a violation of due process. The district court ruled that section 2801–a(10)(b)(i) was inapplicable "where a facility has ceased operations," and that Beechwood therefore suffered no violation. *Beechwood*, 317 F.Supp.2d at 274. On appeal,

the parties vigorously contest whether, under New York law, notice and an opportunity for a hearing was necessary—an issue of first impression and some uncertainty.[6] We need not decide the issue because, even assuming that Beechwood was entitled under State Law to notice and a hearing, there was no due process violation.

We have previously held that where a due process violation results from a "random unauthorized act" by state officials—as opposed to an "established state procedure"—the availability of a "meaningful postdeprivation remedy" defeats the claim: "[T]here *is no* constitutional violation (and no available § 1983 action) when there is an adequate state postdeprivation procedure to remedy a random, arbitrary deprivation of property or liberty." *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880–82 (2d Cir.1996) (emphasis added). The claim in this case is that DOH failed to afford the opportunity for a hearing guaranteed by section 2801–a(10)(b)(i)—a failure that would be an instance of a "random unauthorized act." *See id.* at 881 (holding that claim that "officials acted in flagrant violation of the City Charter and PPB [City] Rules" was a "random unauthorized act" case).[7]

An Article 78 proceeding therefore afforded a meaningful post-deprivation remedy for Appellants' claimed violation. *See id.* at 881–82 (holding Article 78 provided a

---

**6.** There is some ambiguity as to whether [i] Beechwood's establishment approval was nullified *automatically* upon revocation of the operating certificate and as to whether in any event the establishment approval was nontransferable. *See* 10 N.Y.C.R.R. § 600.5(a)(2) ("An approval of establishment *may* be revoked, limited or annulled" if "the operating certificate of a hospital has been revoked, limited or annulled pursuant to the applicable provisions of law" (emphasis added)); *id.* § 600.5(a)(7) ("An approval of establishment

*may* be revoked, limited or annulled" if "the operator has transferred his ownership interest in the operation of the facility without Public Health Council approval, and ... such person has terminated his participation in the operation of the facility" (emphasis added)).

**7.** This claim is in considerable tension with the equal protection claim of differential treatment.

"perfectly adequate post deprivation remedy," and citing cases); *see also Gudema v. Nassau County,* 163 F.3d 717, 724–25 (2d Cir.1998) (same). In an Article 78 proceeding, Beechwood could have argued that Greenberg's license suspension "determination was made in violation of lawful procedure, was affected by an error or law or was arbitrary and capricious or an abuse of discretion," N.Y. C.P.L.R. § 7803, and if Beechwood prevailed, the establishment approval could have been reinstated, or a hearing ordered, *id.* § 7806. "An Article 78 proceeding is adequate for due process purposes even though the petitioner may not be able to recover the same relief that he could in a § 1983 suit." *Hellenic,* 101 F.3d at 881.

We have considered the parties' remaining arguments and find each of them to be without merit.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed as to Appellants' due process claim, equal protection claim, and § 1983 claim against HCFA defendants, and vacated as to Appellant's First Amendment retaliation claim against DOH defendants and remanded for proceedings not inconsistent with this opinion.