**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 2, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DONALD SOUSA,

      Plaintiff - Appellant,

v.

CHIPOTLE SERVICES, LLC,

      Defendant - Appellee.

No. 25-2008

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:23-CV-00811-JB-JFR)**
_____

Alexandra W. Jones, Jones Law Firm, Albuquerque, New Mexico, for Plaintiff-Appellant.

Betsy Bulat, Martenson, Hasbrouck & Simon LLP, Atlanta, Georgia (Maya S. Marshall, Martenson, Hasbrouck & Simon LLP, Atlanta, Georgia; and Carlos M. Quiñones, Quiñones Law Firm LLC, Santa Fe, New Mexico, with her on the brief), for Defendant-Appellee.

_____

Before **PHILLIPS**, **McHUGH**, and **FEDERICO**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

In this diversity case, Plaintiff-Appellant Donald Sousa brought a claim of age discrimination against his former employer, Defendant-Appellee Chipotle Services ("Chipotle"), under the New Mexico Human Rights Act. The district court granted

summary judgment to Chipotle, holding that Mr. Sousa failed to meet his burden of showing that Chipotle's proffered reasons for his termination—pest and cleanliness issues at the restaurants he was responsible for overseeing—were a pretext for age discrimination. We agree with the district court that Mr. Sousa did not present sufficient evidence of pretext to survive summary judgment, and we therefore affirm the district court's decision.

## I.    BACKGROUND

"Because this case arises from an appeal of summary judgment, we present the following factual background in the light most favorable to [Mr. Sousa] as the non-moving party, unless contradicted by the record." *Litzsinger v. Adams Cty. Coroner's Office*, 25 F.4th 1280, 1284 (10th Cir. 2022).

The facts relevant to this appeal can be broken down into three main categories, relating to (1) Mr. Sousa's employment at Chipotle, (2) the termination of another Chipotle employee over the age of fifty, and (3) the conditions at stores managed by two younger Chipotle employees.

### A.    Mr. Sousa's employment

In June 2019, Chipotle hired Mr. Sousa as a field leader. At that time, he was around fifty-four years old and had more than thirty-five years of experience in the restaurant industry.

As a field leader, Mr. Sousa was responsible for overseeing several Chipotle restaurants in New Mexico, with the specific number ranging between six to nine during his time in this position. Chipotle's field leaders do not work in their assigned

2

restaurants daily but instead oversee the restaurants' general managers and conduct regular on-site visits to "the stores in [their] patch, i.e., the stores for which [the field leader is] directly responsible." App. Vol. I at 190.

The field leaders are themselves overseen by team directors. For the first two years of his employment, Mr. Sousa reported to a team director named Kelly Goforth. At some point in 2021, he began reporting instead to a team director named Patrick Hannan, who was about five years younger than Mr. Sousa.

In February 2022, Mr. Sousa was recognized by Chipotle "as a Top-Performing Field Leader" for his results from the previous year. App. Vol. I at 177. This recognition was based on the "AB score" Chipotle internally assigns to its restaurants based on the restaurants' financial performance, throughput, "EcoSure audit scores," and customer satisfaction. *Id.* "EcoSure audits are unannounced food safety audits" that are carried out "on a quarterly basis by a neutral third-party." *Id.* at 172. In 2021, Mr. Sousa's "scores on EcoSure audits were in the top-tier for the entire [c]ompany." *Id.* An EcoSure audit reflects the restaurant's cleanliness, among other considerations.

Around the same time, Mr. Sousa received an annual review and was given the feedback of "Meets Expectation," which is the feedback given to the majority of Chipotle employees. *Id.* at 176. However, Mr. Sousa received "a wage increase that was larger than the window for [his] position," showing that he was "at the top of the Meets Expectation" category. *Id.*

On February 7, 2022, an employee submitted a service request to Chipotle for one of Mr. Sousa's restaurants, Store 2952, which was located at or near the University of New Mexico in Albuquerque, New Mexico. The service request reported "a bad roach infestation throughout the entire restaurant," with cockroaches "seen a lot" in several specific places, including "under the prep sink," "near food contact surfaces," near the transaction counter, and "on the walls behind dry storage and the shelves." *Id.* at 107.

Early the next day, the service request for Store 2952 was forwarded to Mr. Sousa, with Mr. Hannan copied on the email. Shortly after receiving this email, Mr. Hannan wrote an email to Mr. Sousa, stating: "This is alarming. When did this pest problem start? First I'm hearing of it." *Id.* at 105.

Like Mr. Hannan, Mr. Sousa had not known about the pest problem until he received the service request on the morning of February 8. He had never observed any cockroach activity at this restaurant in his prior visits and had not been informed by anyone of the problem prior to receiving the service request. Store 2952's recently promoted general manager, Xavier Bonilla, explained that "the restaurant would be cleaned" before "meetings or walk-throughs were expected," causing it to appear clean when Mr. Sousa visited the store. *Id.* at 213.

At about 1:36 in the afternoon of February 8, Mr. Sousa sent an email regarding the situation to two Chipotle employees responsible for food safety, with Mr. Hannan copied on the email. Mr. Sousa reported that "Orkin will service again tonight and tomorrow on this situation at 2952. We will also do more sanitation

4

recovery today as well." *Id.* at 104. Mr. Sousa also spoke directly with Mr. Hannan about the service report. They discussed "the strategic plan using Orkin and things [they] would do in the restaurant from the sanitation standpoint." *Id.* at 73.

On February 9, 2022, Mr. Hannan and Mr. Sousa visited Store 2952 together. Mr. Hannan was "shocked by the condition it was in." *Id.* at 58. "The restaurant was extremely dirty, and [Mr. Hannan] saw dozens of cockroaches throughout the restaurant." *Id.* After they completed their walkthrough of the restaurant, Mr. Hannan discussed the seriousness of the infestation with Mr. Sousa. Mr. Hannan visited the restaurant and spoke with Mr. Sousa about its condition several more times between February 9, 2022, and March 16, 2022.

An Orkin pest control technician initially visited Store 2952 every other day, but then the visits decreased without Mr. Sousa's approval. Mr. Bonilla alerted Mr. Sousa to the drop off in visits, and Mr. Sousa contacted Orkin and "told them to start coming every other day again." *Id.* at 74. He had this conversation with Orkin between one week to a few days before March 17, 2022. There is no evidence in the record that Mr. Sousa told Mr. Hannan either about the decrease in Orkin visits or about his subsequent request for Orkin to resume coming every other day.

On March 17, 2022, Mr. Hannan visited Store 2952 again "and saw at least six cockroaches within the first 15 or 20 minutes after arrival." *Id.* at 58. Mr. Sousa stayed at the store after Mr. Hannan's visit "and assisted the team closing the restaurant to improve the behaviors." *Id.* at 75.

5

On March 18, 2022, Mr. Hannan "did a walkthrough of a different restaurant in Mr. Sousa's patch, the ABQ Uptown location, with Mr. Sousa and Elsa Armendariz," who was another field leader who reported to Mr. Hannan. *Id.* at 59. Ms. Armendariz was "shocked" by the "lack of standards" and cleanliness issues at this store. *Id.* at 95.

On March 21, 2022, an Orkin service representative visited Store 2952 and prepared an inspection report to document his findings. He reported that he spoke with the manager on duty, who "stated they are just seeing 1 or 2 roaches randomly and mainly in dry storage areas and by the front line." *Id.* at 109. The Orkin representative himself "inspected all areas and didn't see any current activity." *Id.* He reported that he had spoken with Mr. Sousa the previous week, and Mr. Sousa "requested a couple additional services," two of which Orkin had now provided. *Id.* The Orkin representative believed that the management and employees of Store 2952 were "doing a good job of keeping drains clean," and he noted that they "evidently did an additional deep dive clean last Friday 3/18." *Id.* He reported that both Mr. Sousa and the manager on duty "said that the issue has been drastically reduced and again still just seeing the 1 or 2 randomly," and he advised that "[c]ontinued high sanitation practices" would help resolve the issue. *Id.* There is no record evidence to indicate that Mr. Hannan received this Orkin report.

From March 21 through March 24, 2022, two different Chipotle facilities specialists conducted site audits of four restaurants in Mr. Sousa's patch. All four restaurants failed to meet Chipotle's cleanliness standards, although they each

6

received a passing score overall and had no observed pest activity. The facilities specialists emailed their findings from the site audits to both Mr. Sousa and Mr. Hannan, with pictures of the unclean restaurant conditions attached.

When the site audits occurred, Mr. Sousa and the general managers for his restaurants were all in Las Vegas, Nevada, for a company-wide conference. Mr. Sousa asserts that the photographs from the site audits "do not reflect the regularly maintained conditions of the stores in [his] patch," *id.* at 172, but he does not dispute that the conditions shown in these photographs "are not up to Chipotle's cleanliness standards," *id.* at 77. Moreover, he admitted in his deposition that he was not "aware of any other field leaders who reported to [Mr.] Hannan at the time who ha[d] site audit visits as poor [as] th[e]se in one week."[1] *Id.* at 78.

Mr. Bonilla, the general manager of Store 2952 in Albuquerque, testified in his deposition that the cockroach infestation "went away" once Orkin began making more frequent visits to the store. *Id.* at 211. He also testified that the infestation was cleared up before Mr. Sousa was terminated. He did not indicate, however, whether Mr. Hannan was aware that the infestation had cleared up before Mr. Sousa's termination.

---

[1] An individual who regularly conducted site audits of various Chipotle restaurants in Arizona "estimate[d] that one out of three sites . . . would receive a 'No' for cleanliness" despite passing the audit overall. App. Vol. I at 218.

On March 28, 2022, Mr. Hannan met with Mr. Sousa and presented him with three documents filled out by Mr. Hannan. All three documents were dated March 25, 2022.

The first document was a form terminating Mr. Sousa's employment. This form indicated that the reason for the termination was "Food Safety Standards." *Id.* at 61. The termination form documented three prior verbal warnings Mr. Hannan had given to Mr. Sousa. The form also reported details about Mr. Hannan's conversations with Mr. Sousa regarding the cleanliness problems at Store 2952; Mr. Hannan's observation of cockroaches and sanitation issues at Store 2952 on March 17; Mr. Hannan's perception that "[t]he pest control treatments were decreased because the food safety team and [Mr.] Hannan believed that the pest issue had been corrected," causing "the pest issue [to] continue[] at a critical level"; and the fact that three[2] other restaurants in Mr. Sousa's patch failed to meet cleanliness standards during the site audits in March 2022. *Id.* at 61. The termination form concluded: "The above instances constitute a failure to maintain company food safety standards and a lack of reporting critical food safet[]y breaches to his director. The lack of urgency in maintaining food safety standards [is] a liability to Chipotle." *Id.* at 62.

The other two documents that Mr. Hannan gave Mr. Sousa on March 28 were each described as a "Final Warning." *Id.* at 165, 168. These Final Warnings included

---

[2] Although it is undisputed that Mr. Hannan knew that four of Mr. Sousa's restaurants failed to meet cleanliness standards during the March 2022 site audits, Mr. Hannan only listed three of these restaurants on the termination form.

similar narratives to the narrative in Mr. Sousa's termination notice. The first Final Warning indicated that the "[r]eason for corrective action" was "pervasive" problems with cleanliness across Mr. Sousa's patch, as demonstrated by three restaurants failing to meet cleanliness standards during the site audits conducted in March 2022. *Id.* at 165. The second Final Warning discussed the pest and cleanliness problems at Store 2952.

Mr. Sousa did not see or receive any of these forms until his termination. Mr. Hannan testified in his deposition that he gave Mr. Sousa the Final Warnings at the same time as the termination form based on "the guidance of [his Human Resources ('HR')] representative." *Id.* at 97. Although the HR representative did not specifically remember advising Mr. Hannan to give Mr. Sousa the two Final Warnings at the same time as his termination notice, she explained that a Chipotle employee might receive a written warning along with a termination letter because "the idea is to document." *Id.* at 223. She explained that she "suppose[d] the idea of corrective action from [her] perspective is to document what has happened." *Id.* at 224.

### B.    *Ms. Rodriguez's termination*

In addition to managing Mr. Sousa, at the beginning of 2022 Mr. Hannan also managed six other field leaders whose patches were located in Arizona, New Mexico, and Texas. Of these seven field leaders, two were older than Mr. Hannan: Mr. Sousa and Tiffany Rodriguez, who was a field leader in Arizona.

Mr. Hannan terminated Ms. Rodriguez's employment on January 6, 2022. Ms. Rodriguez was then fifty-five years old and had worked for Chipotle for more than seventeen years.

Shortly before Ms. Rodriguez's termination, a cockroach problem was reported at one of the restaurants in her patch, Store 861. This store had been transferred to Ms. Rodriguez's patch in the fall of 2021, having previously been in the patch of Edwin Sanchez, a thirty-year-old field leader in Arizona. When Store 861 was transferred to Ms. Rodriguez, "it was filthy," and she "had to work with the general manager to get it cleaned up." *Id.* at 191. The record does not indicate, however, whether Mr. Hannan knew that Store 861 was filthy when it was transferred from Mr. Sanchez's patch to Ms. Rodriguez's patch.

The cockroach problem was first reported on December 31, 2021. At that time, however, Chipotle's internal systems had not yet finished transferring Store 861 from Mr. Sanchez's patch to Ms. Rodriguez's patch, so Ms. Rodriguez did not receive a notification about it. Instead, the system sent notifications to Mr. Sanchez, Mr. Hannan, and an individual named Joshua Amy, who was the facilities manager for Chipotle restaurants in Arizona.

Ms. Rodriguez learned of the cockroach problem on January 3, 2022. As soon as she learned of the problem, Ms. Rodriguez visited the restaurant, spoke with Store 861's general manager, and contacted both Mr. Amy and Chipotle's pest vendor, Orkin, to ask for assistance. She also contacted Mr. Hannan to discuss her efforts to resolve the problem. Despite these efforts, she was concerned that Mr. Hannan would

10

fire her "because he believed the roach sighting constituted an infestation at Store 861." *Id.* at 191.

In a declaration submitted in this litigation, Mr. Amy stated that "there was nothing extraordinary or unusual about the pest issue in Ms. Rodriguez's stores, especially as compared to Mr. Sanchez's stores." *Id.* at 219. However, he clarified in a later deposition that this statement "was in relation to cleanliness." App. Vol. II at 316. He testified that "the actual amount of bugs," consisting of "thousands of cockroaches," as well as their location "in the wall of the serve line" was "extraordinary." *Id.* at 315–16.

Mr. Hannan terminated Ms. Rodriguez on January 6, 2022, three days after she learned about the pest problem in Store 861. Her position was immediately filled by a new field leader named Fabiola Cruz, who was twenty-seven or twenty-eight years old. Ms. Rodriguez was only thirty days away from her Chipotle stock vesting when she was terminated, causing her to lose $235,000.00.

### C.    *Conditions at stores managed by Liedy Chaparro*

Following Mr. Sousa's termination, his position was filled by a woman in her "[l]ate 20s," Liedy Chaparro. *Id.* at 98. While the restaurants in Mr. Sousa's patch had consistently passed the third-party EcoSure audits before his termination, Store 2952 in Albuquerque failed its EcoSure audit on at least one occasion after it came under Ms. Chaparro's supervision. Neither Ms. Chaparro nor anyone else was terminated based on the failed EcoSure audit.

There is no record evidence of any other problems at any of the restaurants that Ms. Chaparro was responsible for overseeing.

### D.    Conditions at stores managed by Mr. Sanchez

Mr. Amy, Chipotle's facilities manager in Arizona, witnessed "rodent and pest infestation issues at all of their locations[,] some so bad [he could] remember [them] years later off the top of [his] head." *Id.* at 226. He "received work orders for both Mr. Sanchez['s] and Ms. Rodriguez's stores involving pest sightings once per week, on average." *Id.* at 218.

Mr. Amy specifically remembered pest problems in five different stores managed by Mr. Sanchez that occurred around the time of Ms. Rodriguez's and Mr. Sousa's terminations.

In one of Mr. Sanchez's stores, Store 1684, there was a "bad rodent issue in [the] drop ceiling." *Id.* at 226. This problem turned out to be due to holes in the ceiling that the rodents were using to gain entry, which Mr. Hannan asked Mr. Amy to fix. The record contains no indication that the rodent problem persisted after Mr. Amy fixed the holes in the ceiling.

Mr. Amy was aware of roach sightings at another of Mr. Sanchez's restaurants, Store 1726. Mr. Amy recalled "[a] lot of struggles with cleanliness in that restaurant over that time period." App. Vol. II at 307. As far as Mr. Amy knew, however, Mr. Hannan was unaware of the roach sightings at Store 1726. Likewise, the record contains no evidence that Mr. Hannan was aware of Store 1726's "struggles with cleanliness." *Id.*

12

Store 898, which Mr. Amy described as "disgustingly dirty," had problems with ants and cockroaches. App. Vol. I at 226. The employees at this restaurant "had operational issues with cleaning floors" and "would essentially dump so much water that the grout would just disappear after a few months." App. Vol. II at 309. This caused food debris to get stuck where the grout was missing, resulting in the regular "extremely pungent" smell of "mildew or rottenness." *Id.* Additionally, the employees' use of too much water when they cleaned the floor damaged the door sweep, increasing the likelihood that pests would be able to enter through gaps under the door. Due to "all that food debris," this fourth restaurant had "constant pest control issues," with Mr. Amy and other Chipotle employees observing cockroaches and other pests on a "pretty frequent" basis. *Id.* Mr. Amy reported that there were "more than a handful" of cockroaches in this location, and that the cockroaches could in fact be found "[t]hroughout" the restaurant. *Id.*

Mr. Hannan "knew of all the cleanliness issues" at Store 898. *Id.* at 310. Indeed, Mr. Amy "had a long conversation" with Mr. Hannan about "the struggle with cleaning the floors correctly" at this restaurant. *Id.* at 309. However, Mr. Amy did not "know specifically" whether Mr. Hannan was aware of the pest problems in this restaurant, although he thought it was "safe to say it was an assumption" that Mr. Hannan would realize that the cleanliness issues at Store 898 would lead to pest problems. *Id.* at 310.

Mr. Amy recalled that a fourth store managed by Mr. Sanchez, Store 923, had "bad bugs." App. Vol. I at 226. "They would have fruit flies and things like that at

their drains from lack of drain cleanliness, and other flooring cleanliness issue[s] as well, as well as leaving that back door propped open." App. Vol. II at 311. In addition to fruit flies, Mr. Amy also observed cockroaches at this location, although not "more than three to five." *Id.* Mr. Amy was unaware of what Mr. Sanchez did to address the pest problem at this store. And he did not know if Mr. Hannan was aware of any of the problems at this store.

Finally, Mr. Amy recalled that a fifth store, Store 1767, had a "rodent in [the] drop ceiling," App. Vol. I at 226, which had apparently entered the restaurant when someone propped the door open. Moreover, the record shows that Orkin visited this location to respond to pest problems on at least three occasions between October 2021 and March 2022, noting a consistent problem with standing water in the restaurant on every visit. However, the record is silent as to what Mr. Hannan knew about the pest problems and cleanliness issues at Store 1767. For instance, although the Orkin reports for this location are included in the record, there is no evidence that Mr. Hannan ever received these reports or was even aware of their existence.

In addition to the five stores in Mr. Sanchez's patch that Mr. Amy identified as having pest problems during the timeframe in which Mr. Hannan terminated both Ms. Rodriguez and Mr. Sousa, the record indicates that there was later a pest problem at a sixth store managed by Mr. Sanchez, Store 3642. An internal report dated May 15, 2023, described the problem as "COCKROACHES/Several roaches found throughout the store." *Id.* at 232. Both Mr. Hannan and Mr. Sanchez received this

14

report. But the record does not indicate how they responded to this report or whether the problem persisted.

Mr. Hannan did not terminate or discipline Mr. Sanchez for the pest problems in his stores. Instead, Mr. Sanchez was promoted to team director in November 2023.

### E.    Procedural History

Following his termination, Mr. Sousa filed a complaint against Chipotle in the New Mexico state court, alleging that Chipotle violated his rights under the New Mexico Human Rights Act, N.M. Stat. Ann. § 28-1-7(A), by discriminating against him on the basis of his age. Chipotle removed the action to the federal district court pursuant to the court's diversity jurisdiction.

Chipotle subsequently filed a motion for summary judgment, contending that the undisputed evidence showed that Mr. Sousa "was terminated for failing to maintain food safety standards and for failing to keep his restaurants clean—not any other reason." *Id.* at 39. The district court granted the motion, dismissing Mr. Sousa's claims with prejudice. Mr. Sousa then filed this timely appeal.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's entry of summary judgment in favor of Chipotle.

### II.    DISCUSSION

### A.    Standard of Review

"In diversity cases like this one, the substantive law of the forum state governs the analysis of the underlying claims, but we are governed by federal law in determining the propriety of the district court's grant of summary judgment."

15

*Padhiar v. State Farm Mut. Auto. Ins. Co.*, 479 F.3d 727, 732 (10th Cir. 2007) (internal quotation marks omitted). We therefore "review the grant of summary judgment de novo, applying the same standard as the district court pursuant to Rule 56(c) of the Federal Rules of Civil Procedure." *Id.* (quotation marks omitted).

"We will affirm a grant of summary judgment if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Walkingstick Dixon v. Oklahoma ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th 1321, 1333 (10th Cir. 2025) (quoting Fed. R. Civ. P. 56(a)). "The dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (brackets and ellipsis omitted)). In reviewing the summary judgment record, "[w]e view facts in the light most favorable to the non-movants, resolving all factual disputes and reasonable inferences in their favor." *Id.* (quotation marks, brackets, and ellipsis omitted).

### B.    *Substantive Legal Standard*

The New Mexico Human Rights Act provides in pertinent part that employers commit unlawful discrimination when they "discharge," demote," or "discriminate in matters of compensation, terms, conditions, or privileges of employment against any person otherwise qualified because of . . . age." N.M. Stat. Ann. § 28-1-7(A).

The New Mexico Supreme Court applies the federal *McDonnell Douglas* test to analyze discrimination claims under this state statute. *See Cates v. Regents of N.M. Inst. of Mining & Tech.*, 954 P.2d 65, 69–70 (N.M. 1998); *see also McDonnell*

16

*Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). Thus, "it is appropriate to rely upon federal civil rights adjudication for guidance in analyzing a claim under the [New Mexico Human Rights] Act," although the New Mexico Supreme Court has cautioned that its reference to federal decisions in this analysis should not be interpreted to "bind[] New Mexico law to interpretations made by the federal courts of the federal statute." *Gonzalez v. N.M. Dep't of Health*, 11 P.3d 550, 557 (N.M. 2000) (quoting *Smith v. FDC Corp.*, 787 P.2d 433, 436 (N.M. 1990)).

The *McDonnell Douglas* test applies in the summary judgment context when a plaintiff does not have direct evidence of discrimination, providing a framework for courts to "determine if there is sufficient indirect evidence of discrimination for [the plaintiff] to survive summary judgment." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000). Under this framework, "the plaintiff has the burden of presenting a prima facie case of discrimination." *Walkingstick Dixon*, 125 F.4th at 1331 (quotation marks omitted). If the plaintiff meets this burden, "[t]he burden then moves to the employer to articulate a legitimate, non-discriminatory reason for its actions." *Id.* (quotation marks omitted). And "[i]f the employer carries its burden to articulate a legitimate nondiscriminatory reason, the burden shifts back to the plaintiff to demonstrate that the employer's justification is pretextual—not the true reason for the employment decision." *Id.* at 1337 (internal quotation marks omitted).

At the third stage of the *McDonnell Douglas* analysis, "[p]retext can be inferred from evidence revealing weaknesses, implausibilities, inconsistencies,

17

incoherencies, or contradictions in the employer's explanation." *Id.* (quotation marks omitted). Plaintiffs often establish pretext through (1) "evidence that the defendant's stated reason for the adverse employment action was false," (2) "evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances," or (3) "evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff." *Kendrick*, 220 F.3d at 1230. "A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Id.* However, plaintiffs are not required "to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual." *Walkingstick Dixon*, 125 F.4th at 1337 (quotation marks omitted). "The critical question regarding this aspect of the *McDonnell Douglas* rubric is whether a reasonable factfinder could rationally find the employer's rationale unworthy of credence and hence infer that the employer did not act for the asserted non-retaliatory reasons." *Id.* (quotation marks omitted).

"In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear *to the person making the decision*; we do not look to the plaintiff's subjective evaluation of the situation." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011) (internal quotation marks and citations omitted) (emphasis in original). "[T]he relevant inquiry is not whether the employer's

18

proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (quotation marks and brackets omitted).

### C.    Evidence of Pretext

On appeal, the parties do not dispute either that Mr. Sousa can make a prima facie case of discrimination or that Chipotle has put forth a legitimate, nondiscriminatory reason for his termination. This appeal therefore turns on the issue of pretext.

Mr. Sousa primarily contends that the district court erroneously weighed the evidence and failed to take the facts in the light most favorable to Mr. Sousa. "Because our review is de novo," however, "we need not separately address" this argument. *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 947 (10th Cir. 2011). Rather, we apply the correct summary judgment standard in our own de novo review of the record to determine whether Mr. Sousa made a sufficient showing of pretext to survive summary judgment. *See id.*

Mr. Sousa relies on four main categories of evidence to support his pretext argument: (1) evidence that Mr. Hannan gave Mr. Sousa two forms marked "Final Warning" at the time of his termination; (2) evidence that younger employees supervised by Mr. Hannan—specifically, Ms. Chaparro and Mr. Sanchez—were not terminated for pest or cleanliness problems; (3) evidence of Ms. Rodriguez's termination; and (4) evidence of "Mr. Sousa's overall stellar performance with the company." Appellant's Br. at 27. We consider each of these categories in turn, then

address Mr. Sousa's argument that the evidence as a whole gives rise to an inference of pretext.

## 1.    Final Warnings

First, Mr. Sousa contends that a reasonable jury could find Mr. Hannan's professed reason for terminating Mr. Sousa—persistent pest problems in one restaurant and a widespread cleanliness problem in his other restaurants—to be pretextual based on Mr. Hannan's decision to give Mr. Sousa two documents marked "Final Warning" at the same time as his termination form. Mr. Sousa contends that Mr. Hannan's creation of these documents, which were never actually used as a warning, "creates serious questions as to Mr. Hannan's credibility."[3] *Id.* at 20. He asserts that a jury could infer "that Mr. Hannan created these records to give the false appearance that he had given Mr. Sousa multiple opportunities to improve his conduct when he had not." *Id.* at 21.

Mr. Sousa argues: "If Mr. Hannan believed his decision to terminate Mr. Sousa[] was justified, with or without progressive discipline, it begs the question as to why he thought he needed to fabricate the appearance of multiple warnings." *Id.* Although Mr. Hannan answered this question in his deposition, explaining that he created the Final Warnings on the advice of Chipotle's HR department, Mr. Sousa

---

[3] Chipotle argues that Mr. Sousa waived this argument because he argued before the district court only that the Final Warnings breached an implied policy of progressive discipline. However, the record shows that Mr. Sousa in fact raised his credibility argument in his response in opposition to Chipotle's motion for summary judgment. We therefore reject Chipotle's waiver argument and consider Mr. Sousa's credibility argument on the merits.

contends that a jury could disbelieve this testimony and find instead that these warnings were "cooked up" by Mr. Hannan to make it appear that Mr. Sousa was terminated because he failed to improve his conduct despite multiple written warnings. *Id.*

As an initial matter, we note that the termination notice and the Final Warnings were each dated March 25, 2022. Moreover, the termination form makes no reference to any written warnings, despite detailing several prior verbal warnings that Mr. Hannan gave to Mr. Sousa. Thus, these documents on their face do not give rise to a false impression that Mr. Sousa had been given an opportunity to address previously issued written warnings before Mr. Hannan terminated him.

Furthermore, Mr. Sousa presents no evidence to refute Mr. Hannan's testimony that he prepared the two Final Warnings simultaneously with the termination notice because Chipotle's HR department instructed him to do so as a way of documenting the reasons for the termination.[4] Mr. Sousa argues only that a jury could choose to disbelieve Mr. Hannan's testimony on this point. But this court has rejected the idea that a plaintiff alleging employment discrimination can

---

[4] Mr. Sousa suggests that this testimony was refuted by the HR representative's statement that she did not specifically remember giving Mr. Hannan this instruction. We agree with the district court, however, that "[a] reasonable jury could not infer from [the HR representative's] lack of memory of the conversation that it did not occur." App. Vol. II at 415 n.75. Indeed, she indicated that the decision to give an employee a written warning simultaneously with a termination notice is consistent with Chipotle's HR protocols, as "the idea of the corrective action form[] . . . is to document what has happened." App. Vol. I at 224. Thus, although she did not remember the details of her conversation with Mr. Hannan, nothing in her deposition contradicted his testimony that she gave him this guidance.

withstand summary judgment by merely arguing that a jury could disbelieve the defendant's evidence. *See Helget v. City of Hays*, 844 F.3d 1216, 1223 n.3 (10th Cir. 2017).

In *Helget*, we considered a similar "argument that the district court misapplied the summary judgment standard by wrongfully accepting [the plaintiff's former supervisor's] testimony as credible." *Id.* We acknowledged that a district court may not weigh witnesses' credibility on summary judgment, but we explained that "where a nonmoving party (who has the burden of persuasion at trial) fails to provide admissible evidence rebutting testimony offered by the moving party, the question is not one of credibility, but rather the absence of evidence creating a triable issue of fact." *Id.* We held that the nonmoving party "must do more than merely assert that the jury might disbelieve the testimony of [her former supervisor]; she must present her own affirmative evidence of those facts which are contradicted by the interested testimony." *Id.* (quotation marks and brackets omitted). Without such contrary evidence, "attacks on the credibility of evidence offered by a summary judgment movant do not warrant denial of a summary judgment motion." *Nat'l Am. Ins. v. Am. Re-Ins.*, 358 F.3d 736, 742 (10th Cir. 2004).

Because Mr. Sousa presented no evidence to contradict Mr. Hannan's testimony that he created the two Final Warnings on the advice of the HR department, we must accept Mr. Hannan's undisputed testimony on this point. *See id.*; *Helget*, 844 F.3d at 1223 n.3. And Mr. Sousa's appellate arguments regarding the Final Warnings all hinge on the idea that Mr. Hannan's testimony about the reason he

22

created these documents is not credible. Mr. Sousa does not argue that the HR representative instructed Mr. Hannan to create the Final Warnings as a pretext for age discrimination, nor does he otherwise explain why—if this testimony is accepted— Mr. Hannan's creation of the Final Warnings would give rise to an inference of pretext.[5] Therefore, based on our precedential decision in *Helget*, we hold that Mr. Sousa has not shown that the jury could infer pretext based on the two Final Warnings he received simultaneously with his termination notice.

## 2.      Comparison to Ms. Chaparro and Mr. Sanchez

Mr. Sousa next argues that a jury could find that the cleanliness and pest issues in Ms. Chaparro's and Mr. Sanchez's restaurants were comparable to those in Mr. Sousa's restaurants, giving rise to an inference of pretext based on Mr. Hannan's decision not to discipline these younger employees for the same or similar conduct. Mr. Sousa's primary argument on this point is that the question of substantial similarity is always a jury question. In his view, once he pointed to some evidence that Ms. Chaparro and Mr. Sanchez had pest and cleanliness problems at their restaurants, the district court could not evaluate whether he was similarly situated to

---

[5] It is undisputed that Chipotle's written employment policies do not require supervisors to impose progressive discipline before terminating an employee. Accordingly, the fact that Mr. Hannan terminated Mr. Sousa without first issuing a written warning does not in itself give rise to an inference of pretext. *See Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1291 (10th Cir. 2013).

these two employees but was instead required to leave this question for the jury to decide.[6]

We rejected a similar argument in *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108 (10th Cir. 2007). Like Mr. Sousa, the plaintiff in *Riggs* argued that courts are not permitted "to make factual distinctions as to who is 'similarly situated' and whether alleged violations were close enough to a plaintiff's violations for the purposes of summary judgment." *Id.* at 1115. She contended that because she presented some evidence of other employees who were accused of misconduct, the district court was required to deny the employer's summary judgment motion and allow the jury to decide whether she was similarly situated to these other employees. *Id.* at 1115–17.

We rejected that argument. *Id.* at 1117. We acknowledged that "whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Id.* (quoting *George v. Leavitt*, 407 F.3d 405, 414 (D.C. Cir. 2005) (brackets omitted)). But we explained that a court evaluating a motion for summary judgment "must determine whether [a] 'plaintiff has adduced enough evidence to support a finding that the other employee and plaintiff were sufficiently similarly situated to

---

[6] He also argues that the district court erred by suggesting that the problems at his stores needed to be "nearly identical" to those of the younger employees for them to be similarly situated. App. Vol. II at 456. We need not address this argument because, under de novo review, we conclude that Mr. Sousa has failed to establish sufficient similarity even if we agree that he is not required to show that his circumstances were "nearly identical" to Mr. Sanchez's and Ms. Chaparro's.

support an inference of discrimination.'" *Id.* (quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)) (brackets omitted). And if such evidence is not present, "the jury is not entitled to draw an inference of discrimination." *Id.*

Accordingly, "a motion for summary judgment in an employment discrimination case is no different from a motion for summary judgment in any other civil action: the court acts as a gatekeeper, granting judgment as a matter of law unless the plaintiff has adduced relevant and probative evidence sufficient to support a jury verdict in his or her favor." *Id.* We therefore held in *Riggs* that "[t]he district court was plainly allowed to make the determination that [the plaintiff] did not produce sufficient evidence of disparate treatment to create a genuine issue of material fact for trial."[7] *Id.* (emphasis omitted). And this holding applies with equal force here.

---

[7] Mr. Sousa suggests that New Mexico law would allow him to proceed to trial on this issue even if Tenth Circuit precedent would weigh in favor of summary judgment, citing for support to *Juneau v. Intel Corp.*, 127 P.3d 548 (N.M. 2005). We are not persuaded by his reading of *Juneau*, which we view as consistent with our precedents. Furthermore, even if there is an inconsistency, Mr. Sousa does not argue that substantive New Mexico law requires a jury trial on this issue; rather, he argues that New Mexico's summary judgment standard does not permit a court to determine whether an employee has adduced sufficient evidence of substantial similarity to survive summary judgment. In a diversity case, however, a federal court follows its own procedural rules despite applying the state's substantive law. *See Padhiar v. State Farm Mut. Auto. Ins. Co.*, 479 F.3d 727, 732 (10th Cir. 2007) ("In diversity cases like this one, the substantive law of the forum state governs the analysis of the underlying claims, but we are governed by federal law in determining the propriety of the district court's grant of summary judgment." (internal quotation marks omitted)). Accordingly, to the extent there is any inconsistency between the federal and state summary judgment standards, we are governed by federal law in evaluating the propriety of summary judgment and must therefore follow our precedential decision in *Riggs* on this issue.

Although Mr. Sousa's appellate arguments primarily rest on his contention that substantial similarity is a factual issue that must always be decided by a jury, he also briefly argues that the district court erred in concluding that the evidence did not support a finding of substantial similarity. This argument depends in part on his mischaracterization of the record.[8] With respect to Ms. Chaparro, for instance, Mr. Sousa asserts that Store 2952 "failed EcoSure audits, multiple times, under the supervision of [Ms.] Chaparro, Mr. Sousa's replacement." Appellant's Br. at 9. However, his record support for this assertion is a portion of Mr. Hannan's deposition in which Mr. Hannan acknowledged that Store 2952 had failed at least one EcoSure audit following Mr. Sousa's termination and said, "Possibly," when asked if it failed more than once. App. Vol. I at 188. This uncertain testimony would not reasonably support the finding that Store 2952 actually failed EcoSure audits multiple times, and Mr. Sousa cites no other support for his assertion that Store 2952 failed multiple EcoSure audits.

Mr. Sousa points to no evidence that Ms. Chaparro's other stores failed any audits or were otherwise found not to meet Chipotle's cleanliness standards. Nor does

---

[8] Chipotle's brief likewise mischaracterizes the summary judgment record. For instance, Chipotle mischaracterizes the amount of time that elapsed between Ms. Chaparro's promotion to field leader and Store 2952's failed EcoSure audit. However, because Mr. Sousa bears the burden of demonstrating a triable issue of fact on the question of pretext, *see Walkingstick Dixon v. Oklahoma ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th 1321, 1337 (10th Cir. 2025), we focus here on his arguments and the evidence he cites. We view this evidence in the light most favorable to Mr. Sousa but do not accept either party's characterization of the evidence unless it is borne out by the summary judgment record.

he point to any evidence of pest problems in any of Ms. Chaparro's stores, much less evidence that Mr. Hannan was aware of any such problems. Thus, even viewing the record in the light most favorable to Mr. Sousa, the evidence relating to Ms. Chaparro consists solely of the evidence that Store 2952, under her leadership, failed at least one EcoSure audit, and "[p]ossibly" more than one. *Id.*

In his opening brief, Mr. Sousa asserts that, "if this matter proceeded to trial, [he] anticipates that the jury will hear evidence that failing a third-party EcoSure audit is much more severe under industry standards than receiving an arbitrary 'No' for cleanliness on Chipotle's own internal audits." Appellant's Br. at 24. For support, he cites to an argument his attorney made during the summary judgment hearing. However, attorney arguments are not evidence, and Mr. Sousa cannot meet his summary judgment burden by asserting that his attorney's arguments "could be replaced at trial by admissible evidence." *Johnson v. Weld Cty.*, 594 F.3d 1202, 1209 (10th Cir. 2010). Because this argument is not based on any admissible evidence, we must disregard it. *See id.*

Mr. Sousa bears the burden of showing that Ms. Chaparro's performance issues were comparably serious to his, *see Riggs*, 497 F.3d at 1121 n.4, and he cannot meet that burden by simply asserting that he could come up with this evidence if the case proceeded to trial, *see Johnson*, 594 F.3d at 1209. Because he has failed to present evidence showing that failing a single EcoSure audit, or even possibly more, is comparably serious to the persistent pest problems and widespread cleanliness issues for which he was fired, and because he has not pointed to evidence of any

27

other problems in any of Ms. Chaparro's restaurants, he has not met his burden of showing that Ms. Chaparro was similarly situated to him.

As for Mr. Sanchez, Mr. Sousa cites to significantly more evidence of cleanliness and pest problems at Mr. Sanchez's stores than at Ms. Chaparro's. However, we are required to look at the facts as they appeared to Mr. Hannan, *see C.R. England*, 644 F.3d at 1044, and the record contains no evidence that Mr. Hannan was aware of the conditions at most of Mr. Sanchez's stores. Rather, the record supports only a finding that Mr. Hannan knew of the following problems potentially related to Mr. Sanchez: (1) Store 861 had a bad roach infestation shortly after it was transferred from Mr. Sanchez's patch to Ms. Rodriguez's patch; (2) Store 1684 had a rodent issue caused by holes in the ceiling, which was apparently resolved by Mr. Amy's ceiling repairs; (3) Store 898 had persistent cleanliness problems due to the employees using too much water when they washed the floors; and (4) more than a year after Mr. Sousa's termination, several cockroaches were seen throughout Store 3642. With respect to Store 861, however, Mr. Sousa has not pointed to any evidence that would have led Mr. Hannan to the conclusion that the roach infestation was attributable to Mr. Sanchez rather than Ms. Rodriguez. As for the pest problems in Stores 1684 and 3642, Mr. Sousa cites to no evidence that these pest problems, unlike the infestation in Mr. Sousa's Store 2952, were caused by cleanliness issues.[9] Indeed,

---

[9] Moreover, the fact that the cockroach sightings in Store 3642 occurred more than a year after Mr. Sousa's termination "also weakens [the] evidentiary value" of this evidence. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1233 (10th Cir. 2000).

the only evidence that Mr. Hannan was aware of any cleanliness problems at any of Mr. Sanchez's stores comes from Mr. Amy's testimony that Mr. Hannan knew of the cleanliness problems caused by Store 898 employes' "struggle with cleaning the floors correctly." App. Vol. II at 309.

By contrast, when Mr. Hannan terminated Mr. Sousa's employment, he knew that Store 2952 had been experiencing a serious cockroach problem caused by the "extremely dirty" conditions there, App. Vol. I at 58, which Mr. Hannan had personally observed, and which were present despite Mr. Sousa's promise to do "more sanitation recovery" the day before Mr. Hannan's visit, *id.* at 104. Mr. Hannan also knew that four of Mr. Sousa's restaurants had failed to meet cleanliness standards in site audits conducted by two different Chipotle facilities specialists within the same week. Additionally, Mr. Hannan had received photographs from these site audits, which showed a much broader range of cleanliness problems than the poor floor cleaning techniques at issue in Store 898.

Thus, although we view all of the evidence in the light most favorable to Mr. Sousa, the evidence he relies on simply does not support a finding that Mr. Hannan knew of either a widespread failure by Mr. Sanchez's restaurants to meet Chipotle's cleanliness standards or of pest infestations at Mr. Sanchez's stores caused by a lack of cleanliness. We therefore hold that Mr. Sousa did not present sufficient evidence to show that he was treated differently than similarly situated employees who were known by his supervisor to have "violated work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1232.

29

### 3.    Ms. Rodriguez's termination

Mr. Sousa next argues that Ms. Rodriguez's termination, in combination with his own termination, demonstrates a pattern of age discrimination.

An allegation of a pattern of age discrimination that "fails to properly take into account nondiscriminatory explanations [for the employer's decision] does not permit an inference of pretext." *Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1198 (10th Cir. 2006) (quotation marks omitted). Accordingly, to establish pretext, a plaintiff's pattern evidence must "eliminat[e] nondiscriminatory explanations for the disparate treatment by showing disparate treatment between *comparable* individuals." *Id.* (emphasis in original).

Here, the undisputed record evidence establishes that Ms. Rodriguez was terminated after one of the stores in her patch, Store 861, experienced an "extraordinary and unusual" pest infestation involving thousands of cockroaches. App. Vol. II at 315. Mr. Sousa does not dispute that a pest infestation of this size is a legitimate, nondiscriminatory reason for a field leader to be terminated. Nevertheless, he argues that a jury could find that Mr. Hannan used the pest infestation at Ms. Rodriguez's stores, like the pest and cleanliness problems at Mr. Sousa's stores, as a pretext for age discrimination because Ms. Chaparro and Mr. Sanchez engaged in comparable conduct for which they were not even disciplined, much less terminated.

As discussed above, however, Mr. Sousa's evidence regarding Ms. Chaparro is limited to a single restaurant's failure of a single EcoSure audit after both

30

Ms. Rodriguez and Mr. Sousa had been terminated. A jury could not reasonably find from this evidence that Ms. Chaparro was similarly situated to either Ms. Rodriguez or Mr. Sousa.

As for Mr. Sanchez, Mr. Sousa's evidence shows that Mr. Hannan was aware of a rodent issue in one restaurant that was resolved by a ceiling repair, cleanliness issues at another restaurant caused by the employees' flooding of the floor with excessive water, and a single reporting of an unknown number of cockroaches at a third restaurant more than one year after both Ms. Rodriguez and Mr. Sousa were terminated. There is thus some evidence that Mr. Hannan knew of limited pest and cleanliness issues in Mr. Sanchez's stores. But Mr. Amy, who regularly visited and inspected restaurants in Arizona, including the stores in Mr. Sanchez's and Ms. Rodriguez's patches, had never seen anything like the severe infestation at Store 861, which he described as "[o]ne of a kind." *Id.* Based on this record, we are not persuaded that a jury could reasonably find the limited pest and cleanliness problems that Mr. Hannan was aware of in Mr. Sanchez's stores to be comparable to the "[o]ne of a kind" and "extraordinary" infestation of thousands of cockroaches in Ms. Rodriguez's restaurant. *Id.* Likewise, for the reasons discussed above, we conclude that a jury could not reasonably find based on this record that Mr. Hannan was aware of problems at Mr. Sanchez's restaurants that were comparable to the persistent pest problem in Store 2952 and the widespread cleanliness problems in Mr. Sousa's other stores.

31

We accordingly hold that Mr. Sousa's pattern evidence did not "eliminat[e] nondiscriminatory explanations for the disparate treatment by showing disparate treatment between *comparable* individuals." *See Pippin*, 440 F.3d at 1198 (emphasis in original). This evidence is therefore insufficient to defeat summary judgment. *See id.* at 1197–98.

### 4.    Mr. Sousa's prior performance

Mr. Sousa further argues that a jury could infer pretext based on "the disproportionate response of Mr. Sousa's termination compared to Mr. Sousa's overall stellar performance with the company." Appellant's Br. at 27.

"A company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct." *Kendrick*, 220 F.3d at 1233. As we have repeatedly said, "[o]ur role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments." *Id.* (quotation marks omitted).

Although Mr. Sousa may believe that his prior good performance reviews and successful EcoSure audits should have driven Mr. Hannan to give him more time to remediate the pest and cleanliness problems in his restaurants or at least to impose some form of discipline short of termination, "the relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Young*, 468 F.3d at 1250 (quotation marks and brackets omitted). Mr. Sousa has not pointed to any evidence supporting an inference that Mr. Hannan did not honestly believe the

32

reasons he gave for terminating Mr. Sousa. Nor has he pointed to any evidence that Chipotle's formal or informal policies call for a lower level of discipline than termination for a field leader who has experienced a persistent pest problem in one restaurant alongside widespread cleanliness issues in other restaurants. Absent such a showing, we will not second guess Chipotle's business judgment that the pest and cleanliness problems at Mr. Sousa's stores warranted termination despite his previous high performance. *See Kendrick*, 220 F.3d at 1233.

## 5.    Totality of the Circumstances

Mr. Sousa's final argument is that the summary judgment evidence, considered as a whole, gives rise to an inference that Mr. Hannan used the pest and cleanliness issues at Mr. Sousa's stores as a pretext for age discrimination.

Considering all the evidence as a whole, however, we conclude that it is nevertheless insufficient to permit a "reasonable factfinder [to] rationally find the employer's rationale unworthy of credence and hence infer that the employer did not act for the asserted non-retaliatory reasons." *Walkingstick Dixon*, 125 F.4th at 1337 (quotation marks omitted). Mr. Sousa has simply failed to adduce sufficient evidence from which a jury could reasonably find that Mr. Hannan did not in fact terminate him based on the undisputed pest and cleanliness problems at his stores but instead terminated him based on his age.

## III.    CONCLUSION

We conclude that the summary judgment evidence relied on by Mr. Sousa, even viewed as a whole and in the light most favorable to him, is insufficient to

33

reasonably support a finding that Mr. Hannan's nondiscriminatory explanation for his termination was in fact a pretext for age discrimination. We therefore AFFIRM the district court's entry of summary judgment in favor of Chipotle.